**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-10080-NMG |
| | ) | |
| DOUGLAS HODGE | ) | |
| | ) | |
| Defendant. | | |

**DOUGLAS HODGE'S SENTENCING MEMORANDUM**

Leave to file granted on January 27, 2020

Douglas Hodge has lived a life defined by hard work, devotion to his wife and seven children, and dedication to educating and caring for children from disadvantaged backgrounds. Doug rose to leading positions in business and philanthropy through his work ethic and strong moral code. Doug has been, and will remain, a grounded, humble, generous person.

Doug is coming before this Court to be sentenced for a crime that harmed both his family and deserving students who did not have the same resources as his children. Doug feels deep remorse for his decisions, takes full responsibility for his conduct, and is prepared to accept the consequences of his actions. Through this submission, Doug would like to provide the Court with a fuller picture of his life and the context for his conduct, so that the Court can better understand how Doug made decisions that are fundamentally at odds with his core values and inconsistent with how he has lived his life.

In particular, Doug would like to highlight four points:

*First*, Doug's actions that led to his conviction are an aberration from a life otherwise dedicated to strong moral action and leadership and to supporting economically vulnerable children and young students.

*Second*, Doug participated in Rick Singer's process not out of ego or a desire for self-aggrandizement, but rather out of love for his children and an overriding, but misguided desire to be helpful to them.

*Third*, the government's position is that Singer informed Doug that his payments would support programs at universities. And indeed, Doug allowed Singer to assure him that his money would be used to support programs at universities and – after Singer set up his charitable foundation – to benefit underprivileged student-athletes. To be clear, Doug knew that Singer was falsely representing his children as athletes and that his payments would serve as a *quid pro quo*

inducement to university employees to participate in the fraudulent scheme.  Doug is taking complete responsibility for his decisions that have resulted in his criminal conviction.  But an important piece of the story is how Doug comforted himself in his mistaken belief that he was also supporting educational institutions and helping students who were less fortunate than his own children.

*Fourth*, Doug is dedicated to remediating the harm stemming from his actions.  Doug understands that this was a crime of privilege, where wealthy students unfairly and illegally obtained admission to colleges and universities, and he will therefore redouble his efforts to create educational opportunities for underserved children.  And more specifically to this case, Doug met with the government and answered all of the prosecutors' questions as part of his contrition and desire to make full amends for his conduct.  Although Doug does not have a cooperation agreement, he felt that taking this step – meeting with the government to discuss his conduct and his interactions with Singer – was an important element of his personal commitment to take responsibility for his actions and "own" his wrongdoing.

As Doug poignantly describes in his personal statement, he has  always  counseled  his children to listen to that inner voice that tells them right from wrong, but he did not listen to his own voice.  Doug is ashamed of his behavior and feels deep remorse.  Through this sentencing submission, he seeks to provide the Court with the information it needs to craft a just sentence that is sufficient, but not greater than necessary, to achieve the objects of the sentencing process.  Doug is ready to repay his debt to society and then return home not only to support and care for his two youngest, adopted children, but also to renew his efforts to repair the harm his actions have caused by empowering children from disadvantaged backgrounds through education.

I.    **Douglas Hodge's Personal Background and Character**

A.   Personal History, Education and Career

Douglas Hodge was raised as an only child in a middle-class household.[1]  His family moved every couple of years with his father's work such that by the time Doug was twelve years old, he had lived in eight different homes.  Doug's parents showered their only child with attention,

████████████████████████████████████████

Doug was a dedicated student, and he graduated near the top of his high school class, allowing him to gain admission to Dartmouth College.  Doug excelled there, instilling in him a lifelong love of Dartmouth and a deep respect for the power of the college experience.  He forged close friendships that have lasted for decades and began exhibiting the leadership qualities that have defined his life.  In short, Dartmouth was a transformative and definitional experience.

Doug graduated with a drive to succeed.  He worked as a computer salesman, including two years at IBM, before enrolling at Harvard Business School.  Following business school, Doug joined Salomon Brothers, a leading international investment bank, and worked long hours as a bond trader for five years, first in New York and then in London.  By 1989, Doug was seeking a career change, and he reached out to an old friend for advice.  Doug first met this friend in 1978 while in college; they worked together at IBM, and then by coincidence they reunited at Salomon Brothers.  This friend recommended that Doug apply to PIMCO, then a fairly small-sized asset management company based in Southern California.  Doug joined PIMCO later that year, and he remained at the company for 28 years until his retirement in December 2017.

Doug rose through the ranks at PIMCO through a combination of hard work and moral integrity.  Doug was tasked with growing the company's business in Asia, and as a result, he

---

[1] The information in this Personal Background and Character section derives, in large part, from the Presentence Report ("PSR"), as well as information contained in the numerous letters submitted in support of Doug.

moved with his wife and then five children to Tokyo in 2002. The Hodges stayed in Japan for seven years, even as his two oldest children attended boarding schools in California to prepare for college. In 2009, the family moved back to Southern California when Doug received a promotion to Chief Operating Officer, a position that he served in for five years before his further promotion to Chief Executive Officer.

Doug's former colleague notes that the Managing Directors of PIMCO unanimously elected Doug CEO in 2014 because his colleagues "respected his views and his integrity." Dkt. No. 796, Ex. 19 (Benz letter). Doug's colleagues and professional contacts knew with certainty that they could rely on Doug to make the morally correct decision. A former partner at PwC who worked closely with Doug notes that "Doug stood out among his peers as an executive of honor, respect, and integrity," and refers in his letter to the "Doug Hodge standard" that "became a model for a number of other companies in Japan." Dkt. No. 796, Ex. 10 (Mehta letter).

Turmoil at PIMCO tested Doug's leadership skills immediately upon his accession to CEO, as he had to navigate the unexpected departure of the iconic founder of the firm. As another professional contact observes, "[w]hat weighed on Doug – and I was there – was the sanctity of the life-savings of the clients: teachers and firefighters and doctors and police and business people." Dkt. No. 796, Ex. 15 (Feigen letter). Doug's even-keeled and moral leadership helped PIMCO through this difficult period and earned Doug a strong reputation for honesty and moral judgment throughout the industry. Doug was known as someone who would "call[] out bad behavior and not tolerat[e] unethical actions in his firm." Dkt. No. 796, Ex. 1 (Miller letter). Indeed, Doug's longtime friend, a professor of business ethics at Princeton University, uses stories from Doug's professional life each year to teach his students the value of developing ethical habits early in their careers. *Id.*

Doug had always promised his family that if he was fortunate enough to be able to retire when he was 60 years old that he would do so, and therefore at the end of 2017, Doug retired from PIMCO to spend time with his growing family.   Over the past two years, Doug has dedicated himself to parenting his two adopted children, who are now 11 and 13 years old; to expanding his philanthropy, which largely helps children from disadvantaged backgrounds; and to supporting his wife, Kylie, as she continues to lead and grow the international non-profit that she and Doug founded in 2012 with the mission of providing mentoring and healthcare education to girls and young women in impoverished communities around the world.

B. Family

Unlike Doug's parents, Doug and Kylie are raising a large family of seven children.   Doug was, and remains, a hands-on, all-in parent.   As he writes, "the greatest commitment I think a person can make is with his or her heart, and the greatest commitment of your heart is parenthood. Honestly, nothing comes close – at least not for me."  Ex. A (Personal Statement of D. Hodge). Kylie observes that Doug "cries in touching family moments, like Christmas morning when all our kids are together happily giving one another gifts."  Dkt. No. 796, Ex. 3 (K. Schuyler letter).   And Kylie shares that Doug has never missed a child's birthday, noting that he once broke up a 10-day speaking tour in Australia to fly "over thirty hours and 14 time zones across the Pacific to spend less than a day on the ground to attend his son's 10th birthday celebration."  *Id.*

As the family's former nanny explains, Doug takes great joy in his family life, lying in bed to read stories with his younger children, cheering on his older children at every big event, and actively listening to his children's personal problems to guide them through tough situations.  *See* Dkt. No. 796, Ex. 5 (Moore letter).   She summarizes, "Doug is his best self when he is spending time and enjoying his family.  When the whole family is all together, Doug has the biggest smile

on his face."  *Id.*  Kylie refers to such displays of affection as representing the "profound softness of his heart," which is "the hallmark of his being."  Dkt. No. 796, Ex. 3 (K. Schuyler letter).

Doug and Kylie always sought to provide every possible benefit to their children, regardless of any difficulties each child faced.  ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

        ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████  Doug and Kylie also relied on their college counselor, Rick Singer, to create a structure around ██████ college preparation, including weekly tutoring sessions, so that ██████ could prepare ████████ as well as possible to take advantage of the challenging college experience.

In addition to the care and attention Doug and Kylie poured into each of their children, they also sought to instill in their children a commitment to giving back to those less fortunate.  As a result, the family incorporated community service into its routine, including on vacations.  After Doug and Kylie funded the construction of an orphanage in rural Cambodia, their children volunteered at that same orphanage, with their eldest two daughters working together there for a

summer.  The chair of World Assistance for Cambodia comments, "Doug emailed [his children] often during the weeks they volunteered and I was copied.  The correspondences were filled with strong words of encouragement [and] pride toward his children for doing good for others."  Dkt. No. 796, Ex. 6 (Krisher-Steele letter).

The story behind Doug's work for this orphanage in Cambodia is a microcosm of his intertwined approach to parenting and charity.  When Doug and his family were living in Japan, they befriended the chair of the World Assistance for Cambodia, Bernie Krisher (the father of the current chair), who was seeking to establish grade schools in rural Cambodia.  Doug enthusiastically supported this project, and as the current head of this organization notes, the schools have now provided an education to several thousand students from among the poorest families in Cambodia.  Dkt. No. 796, Ex. 6 (Krisher-Steele letter).  Mr. Krisher then approached Doug with a new idea – to build a boarding school that could further the education of the most talented students from the grade schools – and Doug again signed on.  Soon thereafter, Mr. Krisher came back with a third idea – to build an orphanage next to this boarding school so that the students could mentor the young children.  Doug agreed not only to fund the construction of the entire orphanage, but also to support its ongoing operations, including by volunteering there alongside his family.

The children who first entered this orphanage are now young adults, pursuing graduate studies and beginning their careers.  One such student has written a letter to this Court, remarking that, "[w]hen I look back, I don't even know what my life might have been like had I not received Mr. Hodge's support.  Most children who start out in situations like mine are not able to go to school and many end up becoming beggars on the street and often sex-trafficked."  Dkt. No. 796, Ex. 7 (Sophanit letter).  This student describes how Doug's support provides the children in the

orphanage with "all the resources necessary to meet our needs" and that the "support we receive here is better than what most families in Cambodia are able to give to their own children." *Id.* This student from a poor family in rural northwestern Cambodia, whose parents both contracted HIV/AIDS, is finishing his final year at a university where he will earn a degree in architecture.

Doug and Kylie not only helped thousands of families in Cambodia through their work at the orphanage and schools, they also strengthened and grew their family. After caring directly for children as young as infants and seeing children growing up in severe poverty first-hand, Doug and Kylie made the decision to adopt a daughter into their own family. Following that initial decision, Kylie raised the point to Doug that if they only adopted one child, she would essentially grow up as an only child, given the age gap with their other children. Reflecting on his own childhood, Doug agreed that they should adopt two children. After navigating the complexities of international adoption for nearly two years, they met their children, two-year-old ███ and ten-month-old ███, in an orphanage outside of Marrakech, Morocco in May 2009. ████████████████████████████████████████████████████████████████████████████ ██████████████

As the Hodge children have matured, Doug and Kylie's emphasis on charitable work has led each of their three oldest children, who have now graduated from college, to pursue a career aimed at caring for others. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[2]

---

[2] It is no accident that Doug's children have developed these characteristics. Doug and Kylie have emphasized not only the obligation to help others, but have also held their children to high standards. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Now in retirement, Doug has assumed the role of stay-at-home father for thirteen-year-old ▉ and eleven-year-old ▉, seeking to provide his two youngest children with all of the love within his power to give. ████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

C.  Mission-Driven Philanthropy

Doug's efforts to build schools and an orphanage in Cambodia reflect just one small piece of his overarching goal to uplift impoverished communities through programs aimed at children,



especially educational programs.  Between 2007 and 2018, Doug contributed well over $30 million to over 100 different organizations, and approximately 95% of Doug's gifts went to support schools, universities, and programs to assist children in disadvantaged areas.  Dkt. No. 796, Ex. 9 (Pellizzon letter); PSR.  Doug's charitable efforts represent a significant portion of his wealth; he donated, on average, nearly 60% of his earned income each year over the last four years of his employment, and upon his retirement, Doug donated 100% of his deferred bonuses to philanthropic organizations and institutions, with nearly every donation specifically directed to helping young people in need.  *Id.*  As Doug's financial advisor comments, "Doug is the most generous man I have ever dealt with."  *Id.*

Given Doug's time abroad, he focuses many of his efforts in poorer countries, but Doug has also become a leader in his local community.  To take one example, Doug has worked closely with the NOVA Academy, a tuition-free, charter high school serving at-risk and underserved students in a largely Latino community of Santa Ana, California.  Many of the students come from homeless families, and the vast majority are the first in their families to complete high school.  When Doug first met the head of the Academy, he informed her that he wanted to support the school in a "hands-on role."  At that time, Doug was serving as the CEO of PIMCO, was a devoted parent to seven children, and was undertaking many other time-consuming charitable efforts.  Nevertheless, Doug took on the position as the inaugural chairman of the NOVA Academy Children's Foundation.  In that role, Doug arranged for the purchase of the ideal property for the school for $9 million and then provided the school with that entire sum through essentially a no-interest private loan.  Doug then arranged for the financing of an additional $7 million renovation of the space.  After the school opened its doors in 2016, Doug worked diligently to create a relationship with a local community college so that students and graduates of the high school could

more easily and affordably enroll in college-level classes.  Doug also volunteered on multiple
occasions to serve as a panelist for discussions with graduating seniors.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

Doug has also supported numerous other educational institutions in the Greater Los
Angeles region that assist students from underprivileged backgrounds.  As one example, Doug is
one of the leading donors for El Sol Science and Arts Academy, a tuition-free, charter school for
primary and middle school students, also in Santa Ana, California.  Before Doug became involved
with El Sol, it served around 300 students and the school had middling results.  Due to the work
and contributions of Doug and many others, El Sol now serves more than 1,000 students, with
another 1,000 on the waiting list.  A leading publication recently named El Sol as the best dual
immersion school in the country.  Dkt. No. 796, Ex. 16 (Kaplan letter).  One parent recalls a charity
fundraiser at El Sol that Doug was unable to attend, so the school printed out a life-size photograph
of Doug to recognize "his tireless work and contributions."  The entire gathering "went wild
cheering his name and clapping . . . until the moderator had to calm everyone down."  Dkt. No.
796, Ex. 8 (Gomez letter).

Doug and Kylie have also dedicated themselves to supporting Court Appointed Special
Advocates (CASA), an organization that recruits and trains community volunteers to serve as
representatives in court for children with documented histories of severe child abuse and neglect.
The organization has grown exponentially from its humble roots, and now more than 100,000
CASA advocates represent children in courts across the United States.  One of CASA's longtime
Board members remarks, "[l]ooking back over the 30+ years, you can count on two hands the

number of people/couples who made the difference.   Doug and his wife Kylie Schuyler were among the best of that elite group."   Dkt. No. 796, Ex. 12 (Port letter).   Reflecting Doug and Kylie's tremendous work on behalf of CASA, the organization recognized them with its highest award of "Children's Champions" in 2008 and again in 2016.   Doug and Kylie are the only two-time recipients of this award.   *Id.*

In a smaller, but notable display of Doug's charitable nature, about 15 years ago, Doug and his college friends decided to fund the work of their mutual friend, Dr. William Holmes, who had dedicated his life to serving as a doctor in crisis zones around the world.   Until recently, Doug served as the President of the Board of this foundation and has led the drive to expand its donor base (with Doug as the most generous donor).   This organization has now supported 21 different hospitals, schools and orphanages in 13 developing countries – "from hospitals in Afghanistan to scholarship opportunities in Nepal to Ebola response programming in Sierra Leone."   Dkt. No. 796, Ex. 14 (Holmes letter); Ex. 4 (Byrd letter); Ex. 13 (Riley letter).

On a more personal and local scale, when a bright young girl was facing bullying in middle school and felt isolated, Doug and Kylie reached out and brought her into their mentoring-based non-profit.   As this girl's father remarks, "Doug and Kylie became a singular force in mentoring her and watching her grow to her potential."   ██████████████████████   Doug and Kylie helped this girl publish poems and sent her to a conference at the United Nations in New York. And when she wanted to attend a top private high school, Doug and Kylie committed to paying her full tuition for all four years.   This young woman graduated from high school near the top of her class and is now studying at the University of California at Berkeley.   The father writes that Doug and Kylie never "asked for one single thing, not even so much as a 'thank you.'   For us, they are earthly angels."   *Id.*

The capstone of Doug's and his family's charitable efforts is the non-profit that Doug and Kylie founded, Global G.L.O.W., which stands for Girls Leading Our World.  Through the financial support of Doug and his family and the leadership of Kylie, this charity has grown from merely an idea into an organization that mentors girls and young women throughout the world to build self-esteem and self-advocacy.  The organization partners with the United Nations and international non-profits to help girls and young women obtain literacy, maintain physical and mental health, and overcome societal and cultural barriers that serve to limit access to education. Kylie and the leadership team at Global G.L.O.W. have, among many other projects, developed after-school programming that cultivates literacy and fosters self-advocacy; convened local, regional and global summits to create connections among young women who participate in these programs; created mentorship opportunities; held workshops to promote mental, physical and reproductive health; and are now launching a new program to help young women acquire financial, technological and information literacy.  The United Nations has recognized Global G.L.O.W.'s commitment to girls and has invited them to participate in their annual symposium, "The International Day of Girl," for the last two years.  More than 8,000 girls and young women participate in Global G.L.O.W.'s programs each year, and the cumulative numbers are remarkable: in less than a decade, Global G.L.O.W has improved the lives of over 50,000 girls and young women in 29 countries.  *See* Dkt. No. 796, Ex. 15 (Feigen letter) (discussing the impact on girls in Kathmandu, rural Peru, Phnom Penh, and Orange County).  The organization is 90% funded by Doug's family, and Kylie is the driving force behind the work.  *See* Dkt. No. 796, Ex. 9 (Pellizzon letter).

## II.   <u>Involvement with Singer</u>

Doug is acutely aware that his devotion to his family and lifetime of good deeds do not negate the poor decisions he made to participate in Singer's illegal college admissions process. But these core elements of Doug's life – his devotion to his family and dedication to helping his children, his deep appreciation for the power of a transformative college experience, and his practice of giving often and generously to educational institutions – form a critical backdrop to Doug's decision-making process.

Doug's love of his children and desire to help them gain a transformative college experience motivated Doug to seek out the best college counselor he could find.  Doug turned to his longtime and respected friend who had introduced Doug to PIMCO.  This friend recommended Rick Singer as the best possible mentor and guide.  Singer initially presented as an excellent college counselor, consistent with the friend's glowing recommendation.  Singer began working closely with Doug and his daughter, ███████, during the admissions process – planning college trips, editing essays, and advising on classwork and academic performance.  Singer also explained to Doug that he could enhance ███████ chances of gaining admission by making a targeted donation to a specific program at a university.  After ███████ selected Georgetown as her top choice, Singer explained that his connection, Gordon Ernst, the coach of the women's tennis team, would promote ███████ application if Doug agreed to make a donation to the perennially underfunded Georgetown women's tennis program.  Doug initially understood Singer's proposal as a legitimate opportunity to be helpful to his daughter while at the same time supporting an educational institution and one of its athletic programs in need of financial support.  The proposal had a strong pull on Doug, playing to his devotion to his children and his longstanding commitment to supporting educational institutions.

Only after Singer submitted ██████ application did Singer reveal to Doug – but never to ██████ – that he had edited ██████ essay to include false statements about tennis.  Singer assured Doug that he did so merely to give her a tennis "brand" in order to take full advantage of the tennis coach's support.  After ██████ received a letter from Georgetown indicating that she was likely to be admitted, Doug corresponded with Singer about the "official address" for his donation to the tennis team.  Only then did Singer direct Doug to send his contribution to the tennis coach, explaining that doing so would ensure that the tennis team – rather than a different athletic program at the university – received the funds.[3]

Doug's willingness to do everything he could for his children motivated him to follow Singer's directions – through all of the legitimate work related to preparing for tests, editing essays and planning college itineraries, as well as into the morally and legally wrong conduct.  Doug understood that creating a tennis "brand" for his daughter would involve including false and misleading information in her application, and Doug recognized that sending a check to a coach was not the standard process for making a college donation.  Yet Doug allowed himself to accept Singer's assurances, turning away from the troubling, and ultimately illegal, aspects of the process.

Doug and Singer's interactions over the ensuing ten years are instructive.  Following ██████ admission, if Singer knew that Doug was fully aware of the scope of his criminal activities, Singer would have been very open with Doug that he just needed to pay a few bribes and his children would be guaranteed admission into the schools of their choice.  But instead, Singer maintained his story and told Doug that he was making donations to universities and later, through his contributions to The Key Worldwide Foundation ("KWF"), supporting high school

---

[3] The Georgetown tennis coach, Gordon Ernst, has pleaded not guilty.  Mr. Ernst has not indicated whether he spent the money that Mr. Hodge sent to him on tennis team-related expenses.

athletes from underprivileged backgrounds.[4]  Singer also continued to work closely and frequently with all of Doug's children during their college preparation.  Singer assessed each child's academic and extracurricular records, developed lists of potential colleges, arranged campus visits, and developed study plans.  The vast majority of Doug and Singer's correspondences related to his children's progression through their weekly SAT tutoring sessions and efforts to achieve academic goals.  And tellingly, Singer never once broached the topic of cheating on the SAT, even though Singer's test-cheating scheme was fully operational when Doug's fifth child, ███████

████████████████████████████████████████████████████████

███████████████████████████████████████  A reasonable inference from Singer's decision not to propose test cheating to Doug – and the only logical explanation – is that Singer had sized-up Doug and recognized that Doug would never agree to cheating on the SATs.  Singer was correct.  Ultimately, Singer minimized the uncomfortable and illegal aspects of the process for Doug, and Doug took comfort in Singer's assurances that his payments were helping not only his own children, but also the educational institutions to which his children were seeking admission and, through KWF, children from disadvantaged backgrounds.

Doug also received confirming messages that provided some level of support to Singer's portrayal of the process as beneficial to the universities.  For example, after Doug made a donation to the University of Southern California ("USC") Women's Athletic Board in 2015, he received a letter from USC President Max Nikias thanking him for the donation and expressing his hope that Doug's son, ███, would choose to join his sister, ███, in attending USC.  Doug thereafter

---

[4] With regard to Doug's payments to KWF, Singer informed Doug that the money would be used to fund summer camps hosted by college coaches so that high school athletes from disadvantaged backgrounds could attend these camps cost-free.  Singer informed Doug that the student-athletes would benefit by gaining exposure to college coaches and thereby increase their chances of receiving scholarships, and the college coaches would benefit by expanding the pool of potential athletes for their teams, which in turn would benefit the colleges.

received an invitation to a private dinner at Dr. Nikias's house, where Doug and Kylie were seated directly next to Dr. Nikias and his wife, and where Doug received a further invitation to attend a USC football game in the president's private box.  A few years later, when Doug and Singer were discussing how best to help Doug's fifth child – a conversation captured on a consensual recording – Doug expressed his eagerness to meet with a dean at the college to convey his family's interest in making a donation to the school in connection with his son's application.

Doug does not present this context to excuse his decisions or to take credit for not engaging in a separate fraud.  Instead, he seeks to explain how he came to commit a crime that is antithetical to his core values and then justified his actions to himself.  Singer's portrayal of the process as ultimately beneficial to the universities and to underprivileged children alleviated some of Doug's misgivings about the false athletic statements in his children's applications.  And critically, it is not just Doug's own word that Singer told him that his payments would go to the universities.  The government's theory of this case is that Singer did just that.  *See* Gov't's Consol. Resp. in Opp'n to Defs.' Mots. to Compel, Dkt. No. 736 at 24 ("[T]he government has disclosed, during the plea colloquies of multiple parents who have pled guilty to the charged scheme, that Singer told them their money would be directed to specific coaches' athletic programs in exchange for the coaches' fraudulent designation of their children as recruited athletes."); *see also id.* (offering as an example that "Hodge understood that some of the money would be sent to specific programs at USC . . . ." (citing Hodge Rule 11 Hearing Tr. at 12 (Dkt. No. 606))).

Although Doug looked away from the aspects of Singer's work that made him feel uncomfortable at the time, he now sees his actions in a stark light.  He committed fraud, plain and simple.  He made *quid pro quo* payments to facilitate his children's admission to college.  He is deeply remorseful for his decisions – both in agreeing to participate in conduct that was contrary

to what he knew to be right, and in taking the morally dishonorable path of suppressing the harmful implications of his conduct.  Doug acted out of a misguided love for his children, but he knows that this explanation is not an excuse and is prepared to accept the judgment of the Court.

### III.   Doug Is Unequivocally Remorseful and Accepts Full Responsibility

Doug is deeply remorseful for his conduct.  Doug summarized his sentiments at the time of his plea hearing with the following statement:

> I accept full and complete responsibility for my conduct.  I have always prided myself on leading by example, and I am ashamed of the decisions I made.  I acted out of love for my children, but I know that this explanation for my actions is not an excuse.  I also want to apologize to the deserving college students who may have been adversely impacted by this process.  I understand my actions are inconsistent with the way I've lived my life and I promise to spend the rest of my life proving that this lapse of judgment is not who I am.  I commit that I will continue working hard through charitable endeavors aimed at providing educational opportunities to underprivileged students to begin to repair the harm my actions have caused.  Finally, to my family, who bear no responsibility for my wrongdoing, I am so very sorry for any pain I have caused you.  I love you, and I will do everything I can to deserve the love you continue to show me.

Doug feels acute shame for his conduct with Singer because his actions were contrary to the core values that have directed his life from an early age.  Doug has always been a leader, whom classmates and colleagues, friends and family, employees and investors, and charities and people in need learned to trust for his never-ending persistence in pursuing the morally right outcome.  But with Singer, Doug strayed from his own moral code, allowing Singer to insert false statements into his children's college applications and accepting Singer's assurances that he was making donations to universities.  Doug has always been a sharp thinker, prizing in both himself and colleagues a dedication to analyzing complex situations from new perspectives and always questioning the conventional understanding.  But with Singer, Doug failed to ask obvious questions and accepted Singer's excuses and explanations.  Doug has devoted himself to providing opportunities to children from disadvantaged backgrounds – whether that child is an orphan in Cambodia or a high school student in Los Angeles.  But with Singer, Doug put his own children

ahead of students who may not have had the same advantages in life.  Doug feels deep remorse for his actions and the harm that he has caused.  He knows to a certainty that he will never again stray from his moral code.

As detailed above, Doug acted out of an overriding love for his children, and the most painful part of this process for Doug is the harm that he has caused to his family, whom he loves more than he can ever express.  The singular goal for Doug throughout all of his interactions with Singer was to help his children; he has done the opposite.  His actions have brought his children into the national spotlight, he has had to fend off questions shouted at him from some members of the media about his children's involvement, and he has had to admit his illegal conduct with Singer to his children.  Doug was careful to shield his family from any involvement or knowledge, as he did not wish to cheapen in any way his children's college experiences.  He has, of course, done just that.

Doug will spend the rest of his life attempting to repair the harm that he has caused.  To society at large, he will redouble his efforts to provide educational assistance to children from disadvantaged backgrounds, at home, across the country, and around the world.  And to his family, he is committed to working daily to deserve their trust.

One concrete way that Doug has already committed to repairing the harm his actions have caused is by meeting with the government and openly and candidly discussing his involvement with Singer.  For close to four hours, Doug answered every question in a room filled with prosecutors.  Doug recognizes that the government will not request any adjustment to his sentence on the basis of this meeting, but Doug felt that it was important to take this step with the prosecutorial team.

## IV.    Advisory Guidelines Calculations

This Court applied the guidelines in the MacFarlane sentencing hearing in a manner consistent with the method endorsed by the Probation Department and adopted by every other sentencing judge in the related cases.  *See* MacFarlane Sentencing Tr. at 4, *United States v. MacFarlane*, No. 19-cr-10131, Dkt. No. 340; *see also* Vandemoer Sentencing Tr. at 32–33, *United States v. Vandemoer*, No. 19-cr-10079, Dkt. No. 26; Mem & Order at 4–6, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 443; Bizzack Sentencing Tr. at 62–63, *United States v. Bizzack*, No. 19-cr-10222, Dkt. No. 34; PSR.  As this Court concluded, "the fraud/deceit guideline; that is, 2B1.1, is applicable, not the commercial bribery guideline, which is 2B4.1, and . . . there is no specific loss or gain to be applied under the fraud guideline."  MacFarlane Sentencing Tr. at 4:15–19.

The guidelines calculation in this case is similar to the calculation in the MacFarlane case with the exception that Doug pleaded guilty to an additional count of money laundering conspiracy.  After accounting for Doug's acceptance of responsibility, he has a total offense level of six and a Criminal History Category of I because he has no criminal history.[5]  As such, Doug's custodial guidelines range is zero to six months' imprisonment.

Judges in related cases concluded that an offense level of five, which also results in a sentencing range of zero to six months, accurately reflected the seriousness of the offenses

---

[5] The Probation Department calculated a base and adjusted offense level of seven under U.S.S.G. § 2B1.1 for defendants in related cases convicted under 18 U.S.C. § 1349.  After accounting for acceptance of responsibility, Probation determined that the defendants had total offense levels of five.  In Doug's Presentence Investigation Report, the Probation Department likewise determined that Doug's conviction under 18 U.S.C. § 1349 generates a base and adjusted offense level of seven.  Probation then determined that Doug's money laundering conspiracy conviction under 18 U.S.C. § 1956 generates an adjusted offense level of eight, and therefore that the money laundering conspiracy conviction was the determinative count under the grouping rules.  Probation calculated the guidelines level under 18 U.S.C. § 1956 by following U.S.S.G. § 2S1.1(a)(1)'s cross-reference to U.S.S.G. § 2B1.1.  Pursuant to § 2B1.1, Application Note 2(A), because 18 U.S.C. § 1956 is not referenced to § 2B1.1, the base offense level is six.  Next, under U.S.S.G. § 2S1.1(b)(2)(B), Probation calculated a two-level increase to arrive at an adjusted offense level of eight.  Finally, because Doug has accepted responsibility, the offense level is decreased by two levels to arrive at a total offense level of six.  U.S.S.G. § 3E1.1(a).

committed by the defendants in the cases in front of these judges. Three judges sentenced 13 defendants to terms of imprisonment ranging from zero to five months. This Court in the MacFarlane case determined that an offense level of five understated the seriousness of Mr. MacFarlane's offense and concluded that the appropriate offense level was nine. MacFarlane Sentencing Tr. at 7. A guidelines offense level of nine yields a range of 4–10 months, and this Court sentenced Mr. MacFarlane to a term of six months in prison. *See id.* at 42.

The sentencing guidelines calculation for Mr. MacFarlane's offense and Doug's offense differs with regard to the enhancement for money laundering based on Doug's plea to that further charge. However, the additional money laundering charge, which results in Doug receiving a total offense level of six rather than Mr. MacFarlane's total offense level of five, does not warrant a different analysis here. The conduct underlying the fraud and money laundering charges is identical: the money laundering charge arises from the two-step process of the payment being made by Doug to KWF and then from KWF to the ultimate recipient of the funds – the same facts as in Mr. MacFarlane's case, except that Mr. MacFarlane took the extra step of concealing his payment to KWF as "real estate consulting fees." MacFarlane Sentencing Tr. at 18. And the conduct at issue – the so-called "side-door" scheme – is the same. Judge Talwani appeared to register this point and to recognize the closely connected nature of the two offenses in crafting her sentences, explicitly stating that she had "considered the additional potential charge of money laundering that's factored in here and the writing of the checks to the fake fund," but had concluded that the potential money laundering charge did not affect the determination of the appropriate guidelines level. Buckingham Sentencing Tr. at 37:17–19, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 583.

Doug submits that a total guidelines level of six accurately reflects the seriousness of his offense.  Doug recognizes that the conduct at issue is similar to that of Mr. MacFarlane and many other parents, but he asks the Court to evaluate his culpability, and in particular his objectives in participating in this process, on an individualized basis.   Doug's long-time and heart-felt commitment to empowering not only his own children, but young students around the world through transformative educational experiences uniquely informed his decision-making.  Doug acted out of what his wife characterizes as "his overflowing wellspring of love," Dkt. No. 796, Ex. 3 (K. Schuyler letter), and Doug comforted himself in Singer's assurances that his money was supporting educational institutions and disadvantaged children.  Doug's "primary objective," MacFarlane Sentencing Tr. at 7:1, was, as he writes, to "ensure for my children what had been so meaningful for me in my life."  Ex. A (Personal Statement of D. Hodge).  Doug owns the decisions he made and recognizes their consequences, and Doug asks the Court to evaluate his decision-making process and his particular focus on disadvantaged children and their educations when evaluating his conduct.

### V.    A Sentence Toward the Low End of the Guidelines Range Is Appropriate

The Federal Sentencing Statute directs the Court to impose a sentence "sufficient, but not greater than necessary" when considering the defendant's personal history and characteristics, nature and circumstances of the offense, need to avoid unwarranted sentencing disparities, specific and general deterrence, the kinds of sentences available, and other factors.  18 U.S.C. § 3553(a). Doug submits that a sentence toward the low end of the guidelines range is appropriate for four main reasons: (i) Doug's familial obligations, (ii) Doug's extraordinary lifetime of service and how this informed the nature and circumstances of the offense, (iii) Doug's acceptance of responsibility, including his extensive, substantive meeting with the government, and (iv) Doug's

comparative culpability to the already-sentenced defendants and the need to avoid unwarranted sentencing disparities.

    A.  <u>Doug's Familial Obligations</u>

Doug retired at age 60 from the pinnacle of his profession to devote himself fully to his family.  Specifically, Doug committed to parenting his two youngest children, ███████████, who spent the first years of their lives in an orphanage. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██

Critically, Doug is the stay-at-home caregiver for ██████████.  Kylie is working full-time at Global G.L.O.W. and is dedicated to the task of providing education and health care to more than 8,000 girls and young women each year.  Kylie also manages an international food business that allocates all of its profits to fund Global G.L.O.W.  Doug, therefore, is the parent who is the more constant presence in ████████████ lives.  Doug retired to become a primary

caregiver to his children to stabilize the previously inconsistent caretaking arrangements, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

B.  Doug's Extraordinary Lifetime of Service

Doug has lived a life defined by his extraordinary service and his generosity.  He has impacted the lives of orphans in rural Cambodia, hospital patients in Nepal, American children in the justice system who are the victims of abuse and neglect, and aspiring students in Santa Ana. By any measure, Doug has committed himself, now over many years, to remarkable acts of kindness, generosity, and support largely for children and young students from disadvantaged backgrounds.  Again, Doug recognizes that this lifetime of service does not cancel out his actions. But Doug asks that the Court not only consider his actions within the full context of his life, but also evaluate how his life-long dedication to uplifting students through the power of education informed his conduct here.  Doug is committed to returning to his charitable work aimed at helping

vulnerable children and students – and supporting his wife in her own related and critically important endeavors – as soon as he is released from his term of confinement.

### C. Acceptance of Responsibility and Making Amends

Doug fully accepts responsibility for his conduct.  He is ashamed of his decisions, and he is tremendously sorry for the harm his actions have caused.  Doug has already begun attempting to remedy the harm, including by meeting with the government to discuss his conduct.  Doug is also firmly committed to dedicating the rest of his life to providing educational opportunities to children from disadvantaged backgrounds.

### D. Comparative Culpability and Avoiding Unwarranted Sentencing Disparities

Doug submits that a sentence toward the low end of the guidelines range best reflects his relative culpability compared to defendants in related cases who have already been sentenced. Doug compares favorably to parents who engaged in the test-cheating scheme and received custodial sentences measured in weeks, and Doug likewise compares favorably to parents who engaged in the side-door process and received custodial sentences ranging from two to six months.

#### 1. Comparative culpability of test-cheating parents and side-door parents

As an initial matter, in the Abbott case, parents who engaged in the side-door process – that is, agreed to submit false athletic information in their children's college applications and made payments that Singer led the parents to believe would benefit specific programs at the universities – received sentences four to eight times as long as parents who agreed to cheat on the SAT and ACT exams and bribe test administrators to participate in this cheating scheme.  Doug submits that the relative culpability of the two sets of parents does not warrant such a sentencing disparity.

Importantly, Judge Talwani sentenced defendants before the government clarified critical facts concerning Singer's presentation to parents, including Doug, regarding what the "side door"

entailed.   Since those sentencings, the government has disclosed to defendants that Singer informed parents that the side-door payments would benefit the universities, and has clarified that the government is pursuing a theory of bribery that defines a bribe as including payments intended to benefit a specific program at a university that induced a coach or administrator to participate in the fake athlete scheme.   *See, e.g.*, Gov't's Consol. Resp. in Opp'n to Defs.' Mots. to Compel, Dkt. No. 736 at 3, 21, 24.   The government's clarification of its side-door theory may have altered Judge Talwani's analysis.   In particular, Judge Talwani considered the difference in scope between side-door payments in the neighborhood of $200,000 to $300,000 as compared to test-cheating payments that ranged from $15,000 to $75,000 as indicative of greater culpability for side-door parents, reasoning that "the ballpark prices for the two different types of schemes . . . showed that Mr. Singer and the parents involved also have an understanding of the different orders of magnitude of the two schemes."   Semprevivo Sentencing Tr. at 49:20–25, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 499.[6]   But this analysis does not account for the government's recent disclosures that the side-door parents were told that they would be making a financial contribution to programs at universities, where payments in the multi-hundreds of thousands of dollars are not uncommon.

In addition, the object of the two schemes was the same:  to take a spot in a class from a more deserving student.   The parents who participated in the test-cheating scheme and submitted their children's false test scores to schools almost certainly obtained admission to multiple colleges and universities via fraud.   Some test-cheating parents even had the goal of taking a spot at a specific college.   Abbott Sentencing Tr. 13:22–24, *United States v. Abbott et al.*, No. 19-cr-10117,

---

[6] Yet importantly, both Judge Talwani and Judge Woodlock concluded that the culpability of defendants who engaged in the same scheme (whether test-cheating or side-door) did not depend on the amount of money each defendant paid.  Caplan Sentencing Tr. at 41–42, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 515. Bizzack Sentencing Tr. at 110–11.

Dkt. No. 546 ("[T]he Abbotts truly wanted to steal a spot at a specific elite college for themselves, in this case Duke.").  Moreover, the impact of the test-cheating scheme did not just corrupt the admissions process at one school, but instead did so at every school where the students sent their fraudulent applications in addition to corrupting national testing processes relied on by students and colleges across the country.

2.   Comparison to test-cheating parents

Parents involved in the test-cheating scheme have received custodial sentences ranging from a period of probation with no incarceration to one month imprisonment.  Parents with no aggravating circumstances received either a term of probation or a period of incarceration of two weeks.  Parents who were repeat offenders, actively involved their children, proactively sought out Singer for fraud, threatened the testing services with litigation, or who had other aggravating facts received one or two additional weeks of imprisonment.

In particular, we would like to highlight the sentences for three sets of test-cheating parents – Robert Flaxman, Gregory and Marcia Abbott, and Marjorie Klapper.  Mr. Flaxman proactively sought out Singer for the purpose of engaging in fraud, he involved his daughter intricately in the fraud, and he improperly took a charitable deduction.  Flaxman Sentencing Tr. at 12–15, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 578.  Mr. Flaxman received a sentence of one month.  The Abbotts likewise proactively sought out Singer to engage in the fraud, participated in the fraudulent scheme multiple times, and threatened the ACT with legal action when the fraudulently obtained test results were delayed.  Abbott Sentencing Tr. at 9–14.  The Abbotts received sentences of one month.  Ms. Klapper was also a repeat player, proactively sought to engage Singer in the test-cheating scheme, conspired with Singer to create false invoices for SAT tutoring to explain the increase in her son's test scores, misrepresented her son's race and her and

her husband's level of education, and the government maintained that Ms. Klapper did not fully accept responsibility. Klapper Sentencing Tr. at 8–18, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 573. Ms. Klapper received a sentence of three weeks in prison.

Compared to these parents, while Doug acknowledges that he engaged in the admissions process with Singer multiple times and did take one charitable deduction, he did not engage in any of the other behavior found to constitute aggravating circumstances, such as threatening lawsuits or actively involving his children. As a result, if only compared to these parents, Doug would warrant a sentence at or below the sentences of Mr. Flaxman, the Abbotts, and Ms. Klapper.

### 3. Comparison to side-door parents

Parents involved in the side-door process have received custodial sentences ranging from two to six months. Augustin Huneeus received a sentence of five months for participating in both the test-cheating and side-door schemes. The government characterized Mr. Huneeus as the most active of the defendants in front of Judge Talwani. He enlisted his daughter to write a false email and to maintain secrecy about their wrongdoings, took an improper tax deduction, and lied to high school counselors to move his daughter's test site. Huneeus Sentencing Tr. at 8–20, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. No. 551. By contrast, Doug did not actively involve his children in the scheme and did not lie to their high school counselors to move testing sites. And critically, Doug never agreed to participate in the test-cheating scheme. We submit that Doug's conduct is less culpable than that of Mr. Huneeus.

Devin Sloane received a custodial sentence of four months. Mr. Sloane was an active participant in the side-door fraud: he bought water polo equipment from Amazon and enlisted the help of his son in the fraud by taking photographs of his son in a pool in that water polo gear. Mr. Sloane hired a professional design firm to doctor the photographs, and then responded with outrage

when a USC Admissions officer questioned his son's admission as a water polo player.  The Government argued that Mr. Sloane did not fully accept responsibility.  Sloane Sentencing Tr. at 8–11, 59, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. 491.  Doug shares none of these aggravating factors, and we submit that his conduct is less culpable than that of Mr. Sloane.

Stephen Semprevivo received a custodial sentence of four months.  Mr. Semprevivo actively sought out Singer for fraud, and was motivated by a desire to gain status by securing his son's admission at a prestigious university.  Mr. Semprevivo involved his son in the scheme, including by directing his son to send an email to Mr. Ernst detailing his tennis background.  The Government argued that Mr. Semprevivo continued to reflect a lack of acceptance of responsibility and a "disturbing lack of remorse."  Semprevivo Sentencing Tr. at 21, 26, 30, 57, *United States v. Abbott et al.*, No. 19-cr-10117, Dkt. 499.  Doug shares none of the aggravating factors listed above, and we submit that his conduct is less culpable than that of Mr. Semprevivo.

Jeffrey Bizzack received a custodial sentence of two months.  Mr. Bizzack committed substantially the same crime as the other side-door parents, but without aggravating circumstances, and Mr. Bizzack agreed to plead after being confronted by prosecutors pre-indictment.  Bizzack Sentencing Tr. at 110.  Doug's sentence should reflect his relative culpability to Mr. Bizzack.

Finally, Toby MacFarlane received a custodial sentence of six months.  Mr. MacFarlane was a repeat offender who conspired with Mr. Singer to take a tax deduction by writing off his contributions as a real estate consulting expense.  MacFarlane Sentencing Tr. at 18–19, 42.  Mr. Hodge engaged in substantially the same behavior as Mr. MacFarlane, but did not write off his donation to KWF as a business expense.  We submit that Doug's conduct is similar to, but less culpable than, Mr. MacFarlane's.

In summary, Doug believes that his sentence should reflect his comparable culpability to test-cheating parents who received sentences measured in weeks, and his sentence should reflect his favorable comparison to the side-door parents who have already been sentenced. Doug submits that a sentence of incarceration toward the low end of the guidelines range, accompanied by supervised release, a community service program where Doug will help underserved students through hands-on mentoring, and a fine is sufficient, but not greater than necessary to achieve the objects of the sentencing process. Doug also asks the Court to consider whether a split sentence of incarceration and home detention is appropriate, in light of his parental obligations to his two young children.

E.   Additional § 3553 Factors

Concerning specific deterrence, Doug will never stray from his moral code again. He is a first-time offender with zero risk of recidivism who has demonstrated his resolve to repairing the harm his actions have caused. Regarding general deterrence, a term of imprisonment toward the low end of the guidelines range will be sufficient to hammer home the lessons made clear in this and related cases, while sending an equally important message about evaluating each defendant's individual circumstances in the sentencing process.

## CONCLUSION

For the reasons stated above, we submit that a sentence toward the low end of the guidelines range, with a possible split between incarceration and home detention; supervised release; a robust community service program; and a fine is sufficient, but not greater than necessary, especially when balancing Doug's lifetime of service, his commitment to redoubling his charitable efforts upon release from confinement, and his parental obligations to his two young, adopted children.

Dated: January 31, 2020                    Respectfully submitted,

By: _/s/ Brien T. O'Connor_____
       Brien T. O'Connor (BBO #546767)
       *brien.o'connor@ropesgray.com*
       Ezra D. Geggel (BBO# 691139)
       *ezra.geggel@ropesgray.com*
       ROPES & GRAY LLP
       Prudential Tower
       800 Boylston Street
       Boston, MA 02199
       Phone: (617) 951-7000

       Joan McPhee (BBO #547869)
       *joan.mcphee@ropesgray.com*
       ROPES & GRAY LLP
       1211 Avenue of the Americas
       New York, NY 10036-8704
       Phone: (212) 596-9000

       Miranda Hooker (BBO# 661569)
       *hookerm@pepperlaw.com*
       PEPPER HAMILTON LLP
       125 High Street
       Boston, MA 02110
       Phone: (617) 204-5129

       *Attorneys for Defendant Douglas Hodge*

**<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that on January 31, 2020, I filed the foregoing with the United States District Court for the District of Massachusetts using the CM/ECF system, and caused it to be served on all registered participants via the notice of electronic filing (the "NEF").

Dated: January 31, 2020

/s/ Brien T. O'Connor

Brien T. O'Connor
