# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 19-cr-10080-NMG |
| DAVID SIDOO, *et al.*,<br>Defendants. | **REDACTED** |

## GOVERNMENT'S OPPOSITION TO THE MOTIONS OF DEFENDANTS JANAVS AND HODGE TO MODIFY THEIR SENTENCES (Dkts. 1098, 1100, 1102)

The government respectfully submits that this Court lacks authority at this time to act on the motions of defendants Michelle Janavs and Douglas Hodge for compassionate release because neither has exhausted their administrative remedies under 18 U.S.C. § 3582(c)(1)(A).[1] Even if the Court could consider the defendants' motions now, they have not demonstrated that extraordinary and compelling circumstances warrant a reduction of their sentences in light of the relevant factors under 18 U.S.C. § 3553(a), and the fact that the Bureau of Prisons ("BOP") is working to protect the inmate population from the COVID-19 pandemic and to address the unique circumstances of individual inmates. While the government is mindful of the concerns created by COVID-19, the Court should deny the defendants' motions to reduce their sentences and, instead, grant a 60-day continuance of the defendants' respective report dates.

---

[1] As a technical matter, the Court also lacks jurisdiction to decide Hodge's motion in light of his pending appeal. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance," which "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). However, on April 13, 2020, Hodge filed a motion to stay his appeal to permit him to file a motion under 28 U.S.C. § 2255 with the district court. The First Circuit has not yet ruled on that motion, but the government did not oppose it. Thus, the government does not press this jurisdictional argument here.

## RELEVANT BACKGROUND

### Defendant Janavs

Defendant Janavs pled guilty to one count of conspiracy to commit mail and wire fraud and honest services mail and wire fraud, in violation of 18 U.S.C. § 1349, and one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), in connection with her agreement to pay William "Rick" Singer $100,000 to secure high scores for her two daughters on the ACT exam, and to pay $200,000 to have one of her daughters admitted to the University of Southern California ("USC") as a purported beach volleyball recruit.  *See* Dkts. 314 (Second Superseding Indictment); 599 (Clerk's Notes of Rule 11 Hearing).  On February 25, 2020, the Court sentenced Janavs to five months' imprisonment, two years of supervised release, 200 hours of community service, a $250,000 fine, and a $200 special assessment.  *See* Dkt. 922 (Judgment).  At the sentencing hearing, the Court stated: "If we condone bribery in any form or decline to punish it appropriately, we undermine the entire fabric of our society," and noted that Janavs "deserve[s] a prison sentence for deliberately corrupting the college admissions system" because her conduct was "just as onerous as bribing governmental officials."  Dkt. 872 (Transcript) at 53-54.  The Court ordered Janavs to begin serving her sentence on April 7, 2020.  Dkt. 922.

On March 17, 2020, the Court granted Janavs's motion to extend the time to file a notice of appeal to April 20, 2020 and to extend her surrender date to May 7, 2020.  *See* Dkt. 946 (Endorsed Order).  The motion was unrelated to COVID-19, but was premised on Janavs's request for additional time to consult with her attorneys about whether to pursue an appeal or other post-conviction relief.  *See* Dkt. 941 (Motion).  On April 22, 2020, Janavs filed the instant motion to modify her sentence, in which she indicates that she is not pursuing an appeal or other post-conviction relief, and instead seeks an order converting her sentence of imprisonment—which she

has not yet begun to serve—to a term of home confinement.  *See* Dkts. 1098 (public filing), 1100 (sealed filing).

In her motion, Janavs indicates that BOP has designated her to FPC Bryan, and that she sent a letter to Warden Steve Mora on March 23, 2020 asking BOP to convert her five-month prison sentence to home confinement in light of the COVID-19 pandemic.  Because Janavs is not yet in BOP custody, BOP is unable to process her request.

### **Defendant Hodge**

Defendant Hodge pled guilty to one count of conspiracy to commit mail and wire fraud and honest services mail and wire fraud, in violation of 18 U.S.C. § 1349, and one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), in connection with his agreement to pay bribes totaling $850,000 over more than a decade to secure the admission of two of his children to USC and two of his children to Georgetown University.  *See* Dkts. 314 (Second Superseding Indictment); 595 (Clerk's Notes of Rule 11 Hearing).  Hodge also sought unsuccessfully to use bribes to secure the admission of a fifth child to Loyola Marymount University.  *See* Dkt. 840 (Sentencing Transcript) at 63.

On February 7, 2020, the Court sentenced Hodge to nine months' imprisonment, two years of supervised release, 500 hours of community service, a $750,000 fine, and a $200 special assessment.  *See* Dkt. 868 (Judgment).  At the sentencing hearing, the Court stated that Hodge needed "to pay a significant and conspicuous price for unconscionable, egregious criminal conduct in order to deter [Hodge] and others who can't afford it from the blatant misuse of your good fortune."  Dkt. 840 at 64.  The Court ordered Hodge to report to begin serving his sentence on March 20, 2020.  Dkt. 868.

On March 6, 2020, the Court granted Hodge's motion to extend the time to file a notice of appeal to April 10, 2020.  Dkt. 926 (Endorsed Order).  In his motion, Hodge indicated that he would self-report on March 20, 2020.  *See* Dkt. 924 (Motion).  Thereafter, on March 13, 2020, Hodge moved to continue his self-surrender date to May 4, 2020, and the Court subsequently allowed the motion.  Dkts. 939 (Motion); 940 (Endorsed Order).  The primary basis for Hodge's motion was to enable him to continue consulting with his attorneys regarding an appeal or other post-conviction relief, but the motion also noted a concern about BOP's handling of COVID-19. Dkt. 939.  Hodge filed his notice of appeal on April 8, 2020.  Dkt. 1061.  On April 23, 2020, Hodge filed his instant motion to modify his sentence, seeking an order converting it to a term of home confinement.  *See* Dkt. 1102.

In his motion, Hodge indicates that BOP has designated him to FCI Schuylkill.  He does not allege that he has sent any request to the warden at FCI Schuylkill or that he has otherwise sought administrative relief from BOP.

**BOP's Responses to the COVID-19 Pandemic**

In opposing the defendants' motions, the government does not minimize the risks COVID-19 presents to the defendants or other prisoners serving prison sentences.  The Department of Justice is mindful of the concerns created by COVID-19, which is why BOP is making extensive efforts to move as many appropriate inmates to home confinement as possible.  Since the release of the Attorney General's March 26, 2020 memo to the Bureau of Prisons instructing BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, BOP has placed  1,576  inmates  on  home  confinement;  an  increase  of  55.2  percent. https://www.bop.gov/coronavirus/ (last accessed April 28, 2020). The Attorney General's memorandum directed BOP to prioritize transferring inmates to home confinement in appropriate

circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors—particularly those at institutions where there have been COVID-19 outbreaks.  Attorney General Memorandum (Mar. 26, 2020), available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

Further, since at least October 2012, BOP has had a Pandemic Influenza Plan in place.  *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp.  In January 2020, BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* BOP COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.*  In addition, BOP established "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." *Id.*

On or about March 13, 2020, BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*  These national measures were put in place to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.*  For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case

exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, BOP implemented screening protocols for both BOP staff and inmates, with staff subject to "[e]nhanced screening" and inmates subject to screening managed by BOP's infectious disease management programs. *Id.* As part of the inmate screening process, (a) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (b) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (c) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On or about March 18, 2020, BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19, available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require that all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in

quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  *See* BOP COVID-19 Action Plan: Phase Five, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On or about April 1, 2020, BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.  *Id.*

On or about April 13, 2020, BOP implemented Phase Six, which extends all measures from Phase Five to May 18, 2020.  *See* BOP COVID-19 Action Plan: Phase Six, available at https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.  On or about April 24, 2020, BOP expanded its COVID testing capabilities by distributing ten Abbott ID NOW instruments for Rapid RNA testing to facilities experiencing widespread transmission, with the goal of rapidly testing newly symptomatic inmates to quickly confirm their diagnosis, and of expanding testing on asymptomatic or pre-symptomatic inmates so that BOP can quickly isolate and quarantine sick individuals, thereby slowing transmission of the virus.  *See* BOP, Bureau of Prisons Expands COVID-19 Testing (Apr. 24, 2020), available at https://www.bop.gov/resources/

news/pdfs/20200423_press_release_covid19_testing.pdf.   BOP is scheduled to receive ten

additional Abbott ID NOW instruments for Rapid RNA testing this week.  *Id.*

These and other steps contradict any suggestion that BOP is failing to take meaningful

steps to address the risk posed by COVID-19.  They show that BOP has taken the threat seriously,

is working to mitigate it, and continues to update policies and procedures in accord with the

relevant facts and recommendations of experts.

## ARGUMENT

### I.     Neither Janavs Nor Hodge Has Complied with the Statutory Exhaustion Requirements Under § 3582(c)(1)(A).

Under 18 U.S.C. §3582(c), a district court "may not" modify a term of imprisonment once

imposed, except under limited circumstances.  *See Dillon v. United States*, 560 U.S. 817, 824

(2010).  One such circumstance is the so-called compassionate release provision, which provides

that a district court "may reduce the term of imprisonment" if it finds "extraordinary and

compelling circumstances warrant such a reduction," and that "such a reduction is consistent with

the applicable policy statements issued by the Sentencing Commission." 18 U.S.C.

§ 3582(c)(1)(A)(i).  The Court must also consider the "factors set forth in section 3553(a) to the

extent that they are applicable."  *Id.* § 3582(c)(1)(A).

A motion under § 3582(c) may be made either by BOP or a defendant, but in the latter case

only "after the defendant has fully exhausted all administrative rights to appeal a failure of [BOP]

to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a

request by the warden of the defendant's facility, whichever is earlier."  *Id.*  Neither Janavs nor

Hodge has satisfied this exhaustion requirement.

Janavs argues that she has satisfied the exhaustion requirement by (a) sending a letter to

the warden of FPC Bryan, where she has been designated to report, asking to convert her five-

month prison sentence to home confinement, and (b) following up with BOP Regional Counsel. Dkt. 1100 at 13.  But because Janavs is not yet in custody, BOP could not act on her request. Janavs argues in the alternative that more than 30 days have passed since she sent her request to the warden, and any further attempt to exhaust her administrative remedies would be futile.  *Id.* at 13-14.

Janavs's contention that she has satisfied the exhaustion requirements ignores the plain language of the statute, which does not contemplate a motion by an individual who is not yet in BOP custody.  While Janavs may have sent a letter to a warden at a BOP facility, until she actually reports to that facility and is taken into custody, that warden is not the "warden *of the defendant's* facility."  18 U.S.C. § 3582(c)(1)(A) (emphasis added).  At this stage, Janavs has merely been designated to a facility, but she is not in BOP custody.

The legislative history of § 3582(c)(1)(A) supports the conclusion that a defendant must be in custody before she can exhaust her administrative remedies under that section.  Section 603(b) of the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), which added the language permitting a defendant to move for a reduction in her sentence after exhausting her administrative remedies with BOP, is titled, "INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE."  Given that Janavs has not yet been incarcerated, however, she cannot be "released."

BOP's regulations and policies implementing § 3582(c)(1)(A) similarly suggest that relief under that section is limited to defendants who are already in custody, insofar as they refer to "inmates."  *See* 28 C.F.R. § 571.60, *et seq.* ("Under 18 U.S.C. 3582(c)(1)(A), a sentencing court, on motion of the Director of [BOP], may reduce the term of imprisonment of an *inmate* sentenced under the Comprehensive Crime Control Act of 1984.") (emphasis added); BOP Program

Statement 5050.50 (Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)) (rev. Jan. 17, 2019) ("In deciding whether to file a motion under . . . 18 U.S.C. § 3582, the Bureau of Prisons (BOP) should consider whether the *inmate's* release would pose a danger to the safety of any other person or the community.") (emphasis added).  Janavs, of course, is not yet an inmate.

Notably, the cases on which Janavs relies in support of her argument that submitting a request to the warden at FPC Bryan (and receiving a response from BOP) should constitute exhaustion concern defendants who are already in custody.  *See United States v. Macfarlane*, No. 19-cr-10131-NMG, 2020 WL 1866311, at *1 (D. Mass. Apr. 14, 2020); *United States v. Gonzalez*, No. 18-cr-00232-TOR (E.D. Wash. Mar. 31, 2020) (Dkt. 834).  Janavs stands in a different position than the defendants in *Macfarlane* and *Gonzalez* because she is not in custody.  Unlike the defendant in *Gonzalez* who was without any other remedy to pursue relief because she had started serving her term of imprisonment at a county jail while awaiting a designation from BOP, Janavs has a remedy:  asking the Court to postpone her self-surrender date.  And the government assents to that request.

Hodge, for his part, does not claim to have exhausted his administrative remedies, but instead argues that the Court should waive the exhaustion requirement or deem it satisfied because he is "unable" to exhaust.  Dkt. 1102 at 16.  As discussed in Section II, *infra*, the Court cannot waive the exhaustion requirements of § 3582(c).

## II.    The Statutory Exhaustion Requirements Under § 3582(c) Cannot Be Waived.

The circuits are split on whether the exhaustion requirements under § 3582(c) are jurisdictional—such that the Court lacks subject matter jurisdiction to consider the defendants' motions absent a showing they have complied with those requirements—or constitute mandatory

claims-processing rules, such that the Court must enforce the rule if not waived or forfeited by the government. *See United States v. Lugo*, No. 19-cr-00056-JAW, 2020 WL 1821010, at *2-3 (D. Me. Apr. 10, 2020) (noting that Fifth, Ninth, and Tenth Circuits have found the limitations of § 3582(c) to be jurisdictional, while the Seventh Circuit has found they are not). The First Circuit "has not yet weighed in on the issue," but has previously quoted, with seeming approval, a now-overturned Seventh Circuit statement that § 3582(c) "'is a real jurisdictional rule rather than a case-processing requirement.'" *Id.* at *3 (quoting *United States v. Griffin*, 524 F.3d 71, 84 (1st Cir. 2008)). But the distinction is academic, because even if the exhaustion requirements in § 3582(c) are not jurisdictional, the Court "must enforce" a mandatory claims-processing rule "if a party 'properly raises it.'" *Id.* at *2 (quoting *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019)). Here, the government has done just that.[2]

Moreover, in contrast to a judge-made exhaustion doctrine, a statutorily created exhaustion requirement, such as the one in § 3582(c)(1)(A), cannot be waived. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions," while "statutory exhaustion provision[s] stand[] on a different footing" because "Congress sets the rules," and thus, "mandatory language means a court may not excuse a failure to exhaust, even to take [special] circumstances into account"); *see also Booth v. Churner*,

---

[2] The fact that the government objects to the defendants' failure to exhaust here also distinguishes this case from *United States v. Jepsen*, No. 29-cr-00073-VLB, 2020 WL 1640232, at *4 (D. Conn. Apr. 1, 2020), *United States v. Powell*, No. 94-cr-00316, 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020), and *United States v. Gentry*, No. 19-cr-00078-CCC (D.N.J. Apr. 7, 2020) (Dkt. 101) (Amended Consent Order), on which Hodge relies. In those cases, the government did *not* oppose the motions for compassionate release. Indeed, in *Gentry*, the government agreed the defendant had exhausted his administrative rights to appeal BOP's failure to bring a motion for compassionate release on his behalf. No. 19-cr-00078-CCC (Dkt. 98) (letter from government agreeing defendant had exhausted his administrative remedies where he was in BOP custody at a county jail but had yet to be transferred to his permanent placement).

532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").  In *Ross*, the Supreme Court rejected a judicially created "special circumstances" exception to the exhaustion requirement in the Prison Litigation Reform Act of 1995 (PLRA), and demanded fidelity to the statutory text, stating that mandatory exhaustion statutes such as the PLRA foreclose judicial discretion.  *Id.* at 1855-57.  Like the statutory exhaustion requirement in the PLRA, the exhaustion requirement under § 3582(c)(1)(A)—that the Court "may not" modify a term of imprisonment "except" upon a defendant's motion "after" satisfying the exhaustion requirements—is mandatory.  It is, accordingly, not waivable now that the government has raised it.  Thus, contrary to the arguments of both Janavs and Hodge, their failure to exhaust is not waivable.  *See, e.g.*, *Lugo*, 2020 WL 1821010 (denying motion for compassionate release because of COVID-19, despite defendant's kidney problems, because of defendant's failure to exhaust); *United States v. Muniz*, No. 16-cr-10170-MLW, 2020 WL 1898914, *1 (D. Mass. Apr. 16, 2020) (finding the statutory language of § 3582(c)(1)(A) is mandatory and, for the reasons explained in *Lugo*, the court did not have authority to modify defendant's sentence where he had not exhausted); *Cook v. Spaulding*, No. 19-cr-12054-JGD, 2020 WL 231464, *2 (D. Mass. Jan. 15, 2020) (court could not address merits of petitioner's § 3582(c) claim where he had not exhausted his administrative remedies).[3]  Further,

---

[3] *See also United States v. McCann*, No. 13-cr-00052-KKC, 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) (denying COVID-19 motion for compassionate release where defendant failed to exhaust his administrative remedies); *United States v. Ogarro*, No. 18-cr-00373-RJS, 2020 WL 1876300, at *5 (S.D.N.Y. Apr. 14, 2020) (denying COVID-19 motion for compassionate release where defendant failed to exhaust his administrative remedies, despite defendant's asthma, and finding that "nothing in the First Step Act or its history . . . suggest[s] that courts may modulate the exhaustion waiting period when they see fit," and that Congress had an opportunity to address this issue in the CARES Act, Pub. L. No. 116-136 (2020)); *United States v. Rabadi*, No. 13-cr-00353-KMK, 2020 WL 1862640, at *3-*4 (S.D.N.Y. Apr. 14, 2020) (denying COVID-19 motion for compassionate release because defendant had not exhausted his administrative remedies and refusing to waive exhaustion requirement); *United States v. Eisenberg*, No. 16-cr-00157-LM, 2020

the only appellate court to consider this question has found that failure to exhaust under § 3582(c) "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (refusing to remand case to district court for decision on COVID-19 motion for compassionate release where defendant failed to exhaust his administrative remedies, despite district court's indication that it would have granted motion, and despite defendant's age (68 years) and medical conditions, including Parkinson's disease, diabetes, and heart issues).[4]

---

WL 1808844, at *2 (D.N.H. Apr. 9, 2020) (denying motion for compassionate release where defendant had failed to exhaust administrative remedies, despite defendant's health condition); *United States v. Epstein*, No. 14-cr-00287-FLW, 2020 WL 1808616, at *3-4 (D.N.J. Apr. 9, 2020) (denying COVID-19 motion for compassionate release where defendant failed to exhaust his administrative remedies, despite defendant's age (74 years) and medical conditions) (and citing cases); *United States v. Clark*, No. 17-cr-00085-SDD, 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020) (denying COVID-19 motion for compassionate release as not ripe for review because of defendant's failure to exhaust administrative remedies, despite defendant's age (67 years) and medical conditions); *United States v. Eberhart*, No. 13-cr-00313-PJH, 2020 WL 140745, at *2 (N.D. Cal. Mar. 25, 2020) (rejecting defendant's argument that exhaustion requirements under § 3582(c)(1)(A) should be deemed satisfied in light of COVID-19 pandemic and denying motion for compassionate release because defendant had not exhausted his administrative remedies); *United States v. Gileno*, No. 19-cr-00161-VAB, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) (denying COVID-19 motion for compassionate release because defendant, who was incarcerated at FCI Schuylkill, had not satisfied exhaustion requirement of § 3582(c)(1)(A)).

[4] *But see United States v. Guzman Soto*, No. 18-cr-10086-IT (D. Mass. Apr. 17, 2020) (granting COVID-19 motion for compassionate release after finding that the limitations in § 3582(c)(1)(A) are not jurisdictional and may be waived); *see also United States v. Sloane*, No. 19-cr-10117-IT (D. Mass. Mar. 19, 2020) (Dkt. 647) (denying COVID-19 motion for compassionate release where defendant had not exhausted his administrative remedies or "suggest[ed] a life-threatening condition to support a claim that such exhaustion requirements may be excused during this national emergency"). In *Guzman Soto*, the court found that § 3582(c) was not clearly jurisdictional based on "the absence of 'sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements.'" *Id.* at *3 (quoting *Casanova v. Dubois*, 289 F.3d 142, 146 (1st Cir. 2002) (finding the exhaustion requirements of the PLRA are not jurisdictional)). Notably, however, the First Circuit decided *Griffin*, in which it favorably quoted the Seventh Circuit's statement that § 3582(c) "'is a real jurisdictional rule rather than a case-processing requirement,'" six years after *Casanova*.

The handful of cases the defendants cite holding that the exhaustion requirement may be excused are inapplicable because they all rely on a Second Circuit decision interpreting a judicially created, rather than statutory exhaustion requirement under the Controlled Substances Act (CSA). *See United States v. Ben-Yhwh*, No. 15-cr-00830-LEK, 2020 WL 1874125, at * (D. Hawaii Apr. 13, 2020) (relying on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), for holding that "[e]ven where exhaustion is seemingly mandated by statute . . . the requirement is not absolute," even though *Barr* concerned a judicially created exhaustion requirement under the CSA); *United States v. Haney*, No. 19-cr-00541-JSR, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (same); *United States v. Zuckerman*, No. 16-cr-00194-AT, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020) (same); *United States v. Colvin*, No. 19-cr-00179-JBA, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (same); *United States v. Perez*, -- F. Supp. 3d. --, No. 17-cr-00513-AT, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (same); *see also Barr*, 925 F.3d at 119 ("The exhaustion requirement under the CSA is . . . not jurisdictional . . . [and] not mandated by the statute. Rather, it is a judicially-created administrative rule, applied by courts in their discretion").

Enforcing the exhaustion requirements of § 3582(c)(1)(A) promotes "one of the bedrock principles underlying administrative exhaustion—to permit the agency, with its expertise and with its responsibility over the movant, to make a decision in the first instance." *Epstein*, 2020 WL 1808616, at *4 (quotation omitted). Indeed, the Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50 (Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)). Particularly in the context of COVID-19, BOP is in the best position to assess not only a defendant's health circumstances, but also the situation at a facility, how the defendant compares to other inmates, the risks presented to the public by the defendant's

release, and the adequacy of the defendant's release plan.  *See, e.g.*, *McCann*, 2020 WL 1901089, at *2 (exhaustion requirement "recognizes that BOP is better positioned than the courts to first assess issues such as a defendant's health, the adequacy of measures taken by a particular place of incarceration to address any health risks, the risk presented to the public by defendant's release, and the adequacy of defendant's release plan"); *United States v. Annis*, No. 16-cr-00195-JRT, 2020 WL 1812421, *2 (D. Minn. Apr. 9, 2020) (finding exhaustion not waivable, in part because, "given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that [defendant] first attempt to pursue the BOP's administrative remedies," and describing BOP's actions to review at-risk inmates in all federal institutions).[5]

## III.    There Are No Extraordinary and Compelling Reasons Warranting a Reduction in the Defendants' Sentences.

Even if the defendants had exhausted their administrative remedies, their motions should be denied for the separate reason that they cannot establish "extraordinary and compelling circumstances" that would justify reduced sentences under 18 U.S.C. § 3582(c)(1)(A)(i).  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease").

---

[5] Remarkably, the *Guzman Soto* court found that the 30-day waiting period under § 3582(c)(1)(A) did not serve the "purpose of allowing the case to be resolved administratively before proceeding to court," because the court believed a judicial order was required to modify a term of imprisonment, even if BOP moved for compassionate release. 2020 WL 1905323, at *5. This finding overlooks the broad authority BOP has to release inmates to home confinement—the very relief defendants seek here—*without* court involvement. The *Guzman Soto* court also found it could waive the 30-day exhaustion requirement because a defendant's ability to proceed without waiting for BOP to respond "suggests that Congress understood that some requests for relief may be too urgent to wait for the BOP's process." 2020 WL 1905323, at *5. But if that were true, then Congress would not imposed a 30-day requirement at all. *Guzman Soto* is also factually distinguishable because, upon completion of his sentence, the defendant would likely be transferred to the custody of Immigration and Customs Enforcement for removal, *id.* at *2, and would potentially spend additional time in custody as a result.

As detailed above, BOP has instituted substantial policies and procedures to manage the pandemic and prevent the spread of infection, and as of this filing, no staff or prisoners at FPC Bryan or FCI Schuylkill—the facilities to which the defendant have been designated—have tested positive for COVID-19.  *See* https://www.bop.gov/coronavirus/.

With respect to Janavs, the government is sensitive to her underlying medical condition, but notes that it does not overcome her failure to exhaust administrative remedies.  *E.g.*, ███████.  Indeed, as recently as her pre-sentence investigation, Janavs indicated that she was "in good physical health" and "denie[d] suffering from any current medical problems."   Janavs PSR ¶ 117.   At that time, the Probation Office also interviewed Janavs's doctor, Amy Teresi, who submitted a letter in support of the instant motion. Dr. Teresi told Probation that Janavs "did not need to be on these medications," including the ███████ that she apparently takes for her ███████  *Id.*  Janavs's condition is not a "terminal illness," or "a serious physical or medical condition, . . . a serious functional or cognitive impairment, . . . or . . . deteriorating physical or mental health because of the aging process" that qualifies as an extraordinary and compelling reason which "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 app. note 1, and thus a reduction on this ground would not be consistent with the applicable policy statements issued by the Sentencing Commission.  *See* 18 U.S.C. § 3582(c)(1)(A).

With respect to Hodge, contrary to his suggestion, his age of 62 years does *not* put him at a higher risk of severe illness from the virus.  *See* Centers for Disease Control, "People Who Are At Higher Risk for Severe Illness" (last updated Apr. 15, 2010), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

16

(last accessed April 28, 2020) (identifying people 65 or older or with certain underlying medical conditions as having a greater risk for severe illness from COVID-19).  Nor has Hodge identified *any* medical condition that places him at a higher risk for COVID-19.  *United States v. Balogun*, No. 19-cr-10230-DPW-MBB (Dkt. 46) (Apr. 18, 2020) (denying motion for release from pretrial custody based upon defendant's failure to raise particularized concerns).  As the Third Circuit has found, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597 (citation omitted); *see also United States v. Reynoso*, No. 17-cr-10350-NMG (Dkt. 77) (Apr. 21, 2020) (denying motion to modify sentence without prejudice where defendant's concern that the "dormitory like environment" at the FMC Devens satellite camp was conducive to the spread of COVID-19 because social distancing is impractical and staff and new arrestees arrive and leave every day "proffers no more than speculative concern about an outbreak" at the camp, and such "generalized and systemic concern regarding the virulent pandemic are insufficient to demonstrate entitlement to early release").

In any event, when analyzing whether "extraordinary and compelling circumstances warrant . . . a reduction," the Court must consider the "factors set forth in section 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A).  The Court recently considered these factors at the defendants' respective sentencings, and determined that the failure to impose a meaningful punishment would "undermine the entire fabric of our society," and that they must "pay a significant and conspicuous price for unconscionable, egregious criminal conduct" to deter others. Dkt. 872 at 53; Dkt. 840 at 64.  Reducing Janavs's sentence to home confinement in her 11,000 square foot home in the gated community of Newport Coast, California with a gym, media room,

game room, wine cellar, pool, and barbeque area, *see* Janavs PSR ¶ 113, would certainly undermine the goals of punishment and deterrence.  Janavs's suggestion that the publicity surrounding her sentencing already achieved the goal of deterrence is belied by the fact that any reduction in her sentence will likewise be widely publicized, thereby undermining any deterrent effect of her initial sentence.  Similarly, reducing Hodge's sentence to home confinement in his 10,000 square foot home in a gated community in Laguna Beach, California with a pool and 1,200 square foot guest house, Hodge PSR ¶ 163, would undercut the goals of deterrence and punishment.

## IV.   Defendants Are Not Without Recourse.

While the defendants are not eligible for a reduction in their sentence at this time, they can continue to seek to delay their self-surrender dates to the extent COVID-19 continues to spread, as they have already done.  Both defendants contend that delaying their report dates will cause hardship because of the uncertainty about when the pandemic will be under control.  But the entire world is currently experiencing the same anxiety.  Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Disease, has estimated that the development of a vaccine will take 12 to 18 months.[6]  Thus, the defendants should not have to wait indefinitely to serve their sentences, and may be able to begin serving them even before the pandemic ends should they learn they have immunity in connection with the increased antibody testing being conducted.[7]

---

[6] Noah Higgins-Dunn, White House advisor Fauci says coronavirus vaccine trial is on target and will be 'ultimate game changer', CNBC, April 1, 2020, available at https://www.cnbc.com/2020/04/01/white-house-advisor-fauci-says-coronavirus-vaccine-trial-ison-target-and-will-be-ultimate-game-changer.html.

[7] Jill Cowan, What to Know About Studies Using Antibody Tests, NY Times, April 21, 2020, available at https://www.nytimes.com/2020/04/21/us/los-angeles-antibody-testing-coronavirus.html (antibody studies indicate COVID-19 infection rate higher than confirmed cases indicate and many people may have been unknowingly infected).

The defendants also assert that they want to pay their debt to society and move on.  While commendable, the desire to move on with one's life is not an "extraordinary and compelling circumstance" warranting a sentence reduction under § 3582(c)(1)(A)(i).

**V.      Defendants' Sentences Do Not Constitute Cruel and Unusual Punishment in Violation of the Eighth Amendment.**

The defendants suggest that the risk of contracting COVID-19 within a BOP facility is "grossly disproportionate" to their underlying conduct, and thus argue that their prison sentences implicate the Eighth Amendment's prohibition on cruel and unusual punishment.  As an initial matter, this concern is obviated by delaying their surrender dates.  Further, as of this filing, no inmate or staff member at FPC Bryan or FCI Schuylkill have been confirmed to have COVID-19.  Nor can the defendants establish that, should they contract COVID-19 while in custody, their respective facilities would be unable to administer constitutionally acceptable treatment.  Instead, the defendants' concerns are based entirely on speculation and generalized fear—not specific concerns about the quality of personal care, and their Eighth Amendment claim is without merit.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' motions to modify their sentences to home confinement.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Kristen A. Kearney*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
KARIN M. BELL
STEPHEN FRANK
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated:  April 28, 2020                           */s/ Kristen A. Kearney*
                                                  Kristen A. Kearney