**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 19-10080-NMG |
| DOUGLAS HODGE, | ) |
| | ) ***Leave to File 30-Page Brief*** |
| Defendant. | ) ***Granted on 4/29/20*** |

**MEMORANDUM IN SUPPORT OF DOUGLAS HODGE'S MOTION PURSUANT
TO 28 U.S.C. § 2255 TO SET ASIDE HIS PLEA, IN PART, AND FOR
<u>RE-SENTENCING ON THE REMAINING COUNT OF CONVICTION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .................................................................................................3

ARGUMENT.....................................................................................................4

    I.    The Government Misconduct in this Case Undermined the Integrity of Hodge's Plea and Sentencing Proceedings. ...................................................................4

        A.    Governing Law .................................................................................5

            1.    Duty to Disclose Exculpatory Evidence ........................................5

            2.    Duty of Candor to the Court ........................................................6

            3.    Duty of Fairness in Plea Proceedings ...........................................7

        B.    The Government's Suppression of *Brady* Evidence and Material Misrepresentations to this Court and Probation Undermined the Integrity of Hodge's Sentencing Proceedings. ..........................................................7

            1.    The Government Represented the Nature of Hodge's Payments as Bribes to University Officials and Withheld Evidence to the Contrary. ..........................................................................................8

                a.    The Government Has Admitted that the Withheld Evidence Is Exculpatory.........................................................................8

                b.    The Government Systematically Suppressed Exculpatory Evidence and Manufactured Inculpatory Evidence............................10

                    i.    The Government's Misconduct Regarding the Nature of Payments to Loyola Marymount University ("LMU")...............11

                    ii.    At the Time of Hodge's Sentencing Proceedings, the District Court Had Already Underscored for the Government the Material Importance of the Distinction between Donations and Bribes. ..................................13

                    iii.    The Government's Broader Suppression of Evidence Pertaining to the Critical Distinction Between Donations and Bribes Further Confirms the Pattern of Deliberate Government Misconduct in this Case.........................................15

            2.    The Government Represented the Universities as Victims of Singer's Fraudulent Scheme and Withheld Evidence to the Contrary.......................19

        C.    The Government's Misconduct Infected Hodge's Plea Proceedings and Rendered His Plea to the Money Laundering Charge Involuntary.......................21

            1.    Factual Background .................................................................21

            2.    The Suppression of Exculpatory Evidence Prejudiced Hodge in his Decision Whether to Enter a Guilty Plea on the Terms Set by the Government. .....................................................................23

3.    Hodge's Plea to the Money Laundering Charge Was Involuntary. ..............24

a.    The Government's Misconduct in the Lead Up to Hodge's Plea
Was Sufficiently Egregious to Render the Plea Involuntary. ..............24

b.    The Government's Misconduct Caused Hodge to Plead Guilty
to the Legally Invalid Money Laundering Charge. ............................26

CONCLUSION ...........................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*,
373 U.S. 83 (1963).......................................................................................................... *passim*

*California v. Trombetta*,
467 U.S. 479 (1984)..........................................................................................................7

*Ferrara v. United States*,
384 F. Supp. 2d 384 (D. Mass. 2005), *aff'd*, 456 F.3d 278 (1st Cir. 2006)............................27

*Ferrara v. United States*,
456 F.3d 278 (1st Cir. 2006)......................................................................................... *passim*

*Santobello v. New York*,
404 U.S. 257 (1971)..........................................................................................................7

*United States v. Casillas*,
853 F.3d 215 (5th Cir. 2017) .............................................................................................6

*United States v. Hogan*,
862 F.2d 386 (1st Cir. 1988).............................................................................................6

*United States v. Jones*,
620 F. Supp. 2d 163 (D. Mass. 2009) ...............................................................................6

*United States v. Misla-Aldarondo*,
478 F.3d 52 (1st Cir. 2007).........................................................................................26, 27

*United States v. Prochilo*,
629 F.3d 264 (1st Cir. 2011)..............................................................................................5

*United States v. Read*,
778 F.2d 1437 (9th Cir. 1985) ...........................................................................................6

*United States v. Richard*,
234 F.3d 763 (1st Cir. 2000)............................................................................................27

*United States v. Saxena*,
229 F.3d 1 (1st Cir. 2000)..................................................................................................6

*United States v. Severson*,
3 F.3d 1005 (7th Cir. 1993) ..........................................................................................5, 13

*United States v. Snell*,
899 F. Supp. 17 (D. Mass. 1995) .......................................................................................5

*United States v. Truman,*
  688 F.3d 129 (2d Cir. 2012)......................................................................................................6

**Other Authorities**

American Bar Association Standard 3-5.6.......................................................................................7

L.R. 116.2 ............................................................................................................... *passim*

L.R. 83.6.1 ....................................................................................................................................6

Massachusetts Rule of Professional Conduct 3.3 ...........................................................................6

## PRELIMINARY STATEMENT

Douglas Hodge has accepted responsibility for his conduct in knowingly engaging in deceptive practices in connection with the college admissions process. Although he believed he was supporting universities while also helping his children obtain favorable consideration, he has admitted to knowing that William "Rick" Singer was providing his children with a false athletic brand. He has publicly acknowledged that his conduct was wrong and immoral.

Hodge's acceptance of responsibility and acknowledged misconduct does not, however, alleviate the government's core obligations to ensure the fairness of plea and sentencing proceedings and the integrity of the judicial process. The government's most critical obligations pre-trial in a criminal case include its duty to: (1) disclose information favorable to the defense; (2) ensure candor and integrity before the court, in particular at the critical junctures of plea and sentencing proceedings; and (3) refrain from conduct that impermissibly interferes with a defendant's decision whether to enter a guilty plea.

The government breached all three of these obligations. *First*, the government failed to disclose exculpatory information in its possession until after Hodge's plea and sentencing proceedings had concluded—information relevant to Hodge's state of mind and his relative culpability. *Second*, the government made false and misleading statements to this Court; the government's threshold violation of its *Brady* obligations operated to conceal from this Court the false and misleading nature of these statements. *Third*, while engaging in impermissibly coercive tactics, the government threatened Hodge with sharply heightened sentencing exposure for the same underlying conduct, thereby improperly interfering with his decision whether to plead, in a matter of days, on a take-it-or-leave-it basis, to multiple charges, including the unfounded charge of money laundering. The force of these threats would have been substantially undermined—and Hodge's decision-making would have been different—had the government timely complied with

its obligations and disclosed the exculpatory material in its possession.

The government's *Brady* violations warrant particular attention, as the government's conduct was systematic, deliberate, and devastating, not only to Hodge's ability to evaluate the charges against him at the time of his plea, but also to his ability, and to this Court's ability, to ensure that a fair and complete record was available at the time of sentencing. In a highly disturbing submission filed last Friday—in response to this Court's directive to the government to file a sur-reply in response to the non-pleading defendants' misconduct motion—the government made a pivotal admission. As set forth more fully below, *see infra* at 8-10, the government admitted that the evidence it withheld from Hodge and other parent defendants regarding the distinction between "donations" and "bribes" was exculpatory because of its direct bearing on the central question of criminal intent in this case. Specifically, the government acknowledged that, absent clear statements by Singer to parents that the payments were "payments to the coach" rather than "donations to the university," there would be potential confusion regarding the parent's state of mind—calling into question whether the parent had criminal culpability or, instead, had been confused about the nature of the scheme or "duped" by Singer. While the government made these admissions in the context of trying to explain to this Court why it had instructed Singer to be explicit about "bribes" and not to mention "donations" in conversations with his "new clients," the underpinning of the government's explanation—that the distinction was critical to assessing the presence or absence of criminal intent—applies not only to certain Singer clients, but rather, and inescapably, to all.

Hodge moves pursuant to 28 U.S.C. § 2255 for a re-sentencing proceeding to allow the Court to consider the wrongfully withheld evidence that bears materially on his state of mind and relative culpability in mitigation of punishment. Due to the nature of the government's misconduct

and its impact on the voluntariness of his plea to the money laundering charge, he further seeks an order setting aside his plea to that one charge.

## BACKGROUND

On April 9, 2019, the government issued an indictment charging Hodge and 18 other defendants with one count of conspiracy to commit mail and wire fraud and honest services mail and wire fraud and one count of conspiracy to commit money laundering, based on allegations that they conspired with Singer to secure the admission of their children to various colleges through bribery and other means (the "Indictment"). *See* Dkt. No. 314.

Hodge and his co-defendants repeatedly asked the government to disclose exculpatory evidence, including evidence reflecting their understanding that they were making donations to universities and not bribes to individual coaches. On May 30, 2019, the government told defense counsel that it knew of "no information or materials" constituting "exculpatory evidence" under Local Rule 116.2(b)(1). 5/30/19 Letter, Dkt. No. 972-02. At the initial status conference on June 6, 2019, defense counsel challenged the government's narrow view of its *Brady* obligations. Defense counsel explained that "[i]f Rick Singer was telling other parents that the money that they were giving to Key Worldwide was going to go to the athletic programs, we think that's exculpatory." Dkt. No. 396 at 10. When the government disagreed, defense counsel emphasized the "chasm[]" between the parties, noting that "[i]f money went to a school, whatever the discussions, it's not a bribe, at least not a bribe within the ambit of the Government's allegations in this case." *Id.* at 13. Magistrate Judge Kelley then "urge[d] the Government" to turn over information if the defendants provided "any arguable reason" that it was exculpatory. *Id.* at 14. The government, however, failed to produce any of the recently disclosed material in its possession until *after* Hodge's plea and sentencing proceedings had concluded.

Hodge pleaded guilty to the charges in the Indictment on October 21, 2019. Dkt. No. 595.

In the months following Hodge's plea, the government submitted its statement of offense conduct and related information to the Probation and Pretrial Services Office ("Probation"). Probation issued its final Pre-Sentence Report ("PSR") on January 31, 2020.

On February 7, 2020, this Court sentenced Hodge to a term of nine months of imprisonment, two years of supervised release, a fine of $750,000, 500 hours of community service, and a special assessment of $200. *See* Dkt. No. 868.

On February 26, 2020, two and a half weeks following Hodge's sentencing and on the same day that judgment entered against Hodge, the government began a series of rolling productions to Hodge and other defendants containing material, exculpatory evidence, as described in detail below. The government was aware of and in possession of this evidence as early as October 2018.

On April 8, 2020, Hodge filed a Notice of Appeal, *see* Dkt. No. 1061, to ensure that, to the extent he was procedurally required to pursue a direct appeal in the first instance, he had timely complied. The First Circuit docketed the appeal on April 13, 2020, and Hodge filed an assented-to motion to stay the appellate proceedings that same day pending this Court's resolution of the instant motion.

In moving for relief pursuant to 28 U.S.C. § 2255, Hodge does not seek to rescind his acceptance of responsibility for his actions giving rise to the mail and wire fraud conspiracy charge. Rather, he asks that this Court consider the import of the suppressed, exculpatory evidence and the government's related misconduct in assessing the voluntariness of his plea, as it pertains to the money laundering charge, and the integrity of the record upon which Hodge was sentenced.

## ARGUMENT

**I.      The Government Misconduct in this Case Undermined the Integrity of Hodge's Plea and Sentencing Proceedings.**

As set forth below, the government made false and misleading representations to this Court

and Probation while suppressing contrary evidence that bears materially on Hodge's state of mind and relative culpability in mitigation of punishment, thereby warranting a re-sentencing proceeding. In addition, the government engaged in misconduct in the lead up to Hodge's plea, impermissibly threatening him with a federal program bribery charge under 18 U.S.C. § 666, with dramatically heightened sentencing exposure for the same underlying conduct, while withholding material, exculpatory evidence bearing on whether Hodge had engaged in conduct proscribed by the newly threatened charge. The government's misconduct—combining serious *Brady* violations with other impermissibly coercive tactics—rendered Hodge's plea to the money laundering charge involuntary.

### A.      Governing Law

In connection with plea and sentencing proceedings, as set forth above, the government must adhere to its obligation to disclose material information that is favorable to the defense, fulfill its duty of candor before the court, and refrain from conduct that impermissibly interferes with a defendant's decision whether to enter a guilty plea and, if so, on what terms.

### 1.      Duty to Disclose Exculpatory Evidence

The government has a constitutional duty to disclose all evidence "favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). "[S]ince the *Brady* obligation is a constitutional one," if there is any doubt as to whether material is subject to disclosure, "the Government should err on the side of disclosure to the defense." *United States v. Snell*, 899 F. Supp. 17, 22 n.11 (D. Mass. 1995). The suppression of exculpatory evidence bears on the voluntariness of a guilty plea and serves as grounds for re-sentencing. *See, e.g.*, *Ferrara v. United States*, 456 F.3d 278, 292-93 (1st Cir. 2006); *United States v. Severson*, 3 F.3d 1005 (7th Cir. 1993).

In addition, because of the government's "enduring difficulty in discharging its duty to

disclose material exculpatory information to defendants in a timely manner," this Court promulgated Local Rules to serve as a "road map" for government compliance with *Brady*. *United States v. Jones*, 620 F. Supp. 2d 163, 168-70 (D. Mass. 2009). The Local Rules provide that the government must produce information that "tends to cast doubt on [a] defendant's guilt" and, "[b]efore any plea or . . . the submission by the defendant of any objections to the Pre-Sentence Report, whichever first occurs," must produce a written summary of any information in the government's possession that tends to diminish the degree of a defendant's culpability. L.R. 116.2.

2.    Duty of Candor to the Court

Running in parallel with the government's obligation to disclose favorable evidence to the defense is the government's duty of candor to the court. Massachusetts Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Mass. R. Prof'l Conduct 3.3; Local Rule 83.6.1. While all attorneys have a duty of candor, courts have observed that the "prosecution has a special duty not to mislead." *United States v. Truman*, 688 F.3d 129, 143 (2d Cir. 2012). The prosecution cannot "stand mute in the face of factual inaccuracies or . . . withhold relevant factual information from the court." *United States v. Casillas*, 853 F.3d 215, 218 (5th Cir. 2017).

With respect to sentencing proceedings, the prosecution "has an unswerving duty to bring all facts relevant to sentencing to the judge's attention." *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000). "[H]alf-truths and evasions will not do" to satisfy this obligation. *United States v. Hogan*, 862 F.2d 386, 389 (1st Cir. 1988). It follows that "any time a prosecutor is aware that the court is about to impose sentence based upon incomplete or inaccurate information, the prosecutor has the duty to inform the court of the correct or missing information." *United States v. Read*, 778 F.2d 1437, 1442 (9th Cir. 1985) (internal citation omitted).

3.      Duty of Fairness in Plea Proceedings

Under the Due Process Clause, "criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). The Supreme Court has specifically noted the importance of such principles of "fairness in securing agreement between an accused and a prosecutor." *Santobello v. New York*, 404 U.S. 257, 261 (1971). To ensure that a plea is entered voluntarily, the prosecution must refrain from "egregiously impermissible conduct," such as threats, misrepresentations, or, as set forth above, violations of the government's obligation to timely disclose material evidence favorable to the defense. *Ferrara*, 456 F.3d at 290. The American Bar Association has further elaborated that the prosecutor should disclose "information currently known to the prosecutor that tends to negate guilt, mitigates the offense or is likely to reduce punishment," and should not "knowingly make false statements" in the course of plea negotiations, or "set unreasonably short deadlines," or otherwise impose conditions that are "so coercive that the voluntariness of a plea . . . is put into question." ABA Standard 3-5.6.

*          *          *

As the United States Supreme Court stated in *Berger v. United States*, the government "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." 295 U.S. 78, 88 (1935). Here, the government violated its core obligations in connection with Hodge's sentencing and also at the time of his plea proceedings, each addressed in turn below.

**B.      The Government's Suppression of *Brady* Evidence and Material Misrepresentations to this Court and Probation Undermined the Integrity of Hodge's Sentencing Proceedings.**

The government's failure to adhere to its obligations under *Brady* and the Local Rules, and its related failure to honor its duty of candor before the Court, manifest across multiple categories

7

of suppressed exculpatory evidence and corresponding false and misleading statements to this Court.

1.   The Government Represented the Nature of Hodge's Payments as Bribes to University Officials and Withheld Evidence to the Contrary.

The government impermissibly withheld evidence bearing on the nature of the payments made by Hodge in connection with Singer's fraudulent scheme. Specifically, the government withheld evidence reflecting Hodge's understanding that the payments he was making in connection with the college admissions process were donations to universities or university programs for the benefit of the universities, and *not* bribe payments to university employees for the personal benefit of those employees. The government's systematic withholding of this exculpatory information—within individual cases and more broadly across the parent cases—was designed to create, and had the effect of creating, the unambiguous *appearance* of stark criminality—black and white "line the pockets" bribery uncomplicated by evidence suggestive of more ambiguous conduct or confusion about the true nature of Singer's scheme. The evidence withheld from the defense, and from this Court—had it been timely disclosed—would have revealed facts and circumstances relevant, material, and favorable to the defense in mitigation of punishment at the time of Hodge's sentencing.

a.   The Government Has Admitted that the Withheld Evidence Is Exculpatory.

In striking form, the government has itself admitted to the material and exculpatory nature of the evidence it suppressed on the critical distinction between donations and bribes. In its recently filed Sur-Reply, Dkt. No. 1104, the government explained to this Court, in attempting to put its conduct in an honorable light, that it had instructed Singer, in calls with "new clients," to be explicit that the payments they would be making were going "to the coach." *Id.* at 3. In the government's own words, it "wanted to make sure that anyone who decided to pursue the scheme at that point—

when it was, effectively, a government sting operation—understood that their money would be used to induce a university insider to commit fraud, and could not later claim that they had been duped or entrapped." *Id.* at 3-4. Underscoring the imperative of clarity on this point, the government further explained to this Court that it "wanted to ensure that the crime would be obvious to anyone involved in it." *Id.* at 8; *see also* Keating Aff. ¶ 9 (explaining that the purpose of instructing Singer to tell clients that the scheme involved "paying coaches" was to ensure that "there would be no possible confusion about [the clients'] intent"). Having admitted to the imperative of clarity on the central question of intent as it pertained to "donations to the university" versus "payments to the coach," the government cannot now contend that what was required for parents going forward was not likewise essential *for all parents* to ensure that the parent had the requisite criminal intent and had not been confused or, in the government's own framing, "duped" by Singer regarding the nature of his scheme.

In the government's Sur-Reply, including the attached affidavits of the Assistant United States Attorney and the agents, and also the FBI 302 of Singer's April 24, 2020 interview with the government, the government now acknowledges that Singer was resistant to using the language of "bribes" or "bribery" because "he had already told [the parents] that their money would go to an athletic program, not a coach." Dkt. No. 1104 at 5; *see also id.* at 8; Rosen Aff. ¶ 6 ("I understood that Singer was not usually . . . explicit with his clients [that money was going to be paid to a coach], typically telling them that the money was a 'donation' to an athletic 'program.'"); Keating Aff. ¶ 9 (same); Smith Aff. ¶ 9 (same); 4/24/20 Singer 302, Dkt. No. 1104-4 at 1 ("Singer didn't want to use the word bribe, that is not how he talks and he hadn't said it before."); *id.* at 2 ("Singer stated that he didn't like being told to say bribe and payment going to coaches, and not a donation. Singer pushed back on that and said to the agents that is not what he said to parents.").

What is now undeniable from the recently disclosed evidence and the government's own admissions is that, at the same time the prosecutors and agents were browbeating Singer to use the words "bribe" and "payment to coaches," and not "donations,"[1] in order to ensure clear evidence of his new clients' guilt, when it came to Hodge and other parent defendants, the prosecution was pursuing an opposite, and deeply dishonorable and unlawful, strategy. Specifically, far from seeking to ensure the clarity the prosecutors themselves had recognized to be imperative in assessing individual intent and criminal culpability for the so-called "new clients," they systematically sought to elide that critical distinction when it came to Hodge and the other parent defendants. The government spoke with one voice before this Court and to the defense about "bribes" and "payments to coaches," while systematically hiding from this Court and the defense Singer's exculpatory statements—statements that the prosecutors had identified, and had expressly sought to rule out, for Singer's "new clients." Having admitted to the perceived potential for a parent to be confused or even "duped" by Singer in the absence of the explicit language of bribery—the payment *going to the coach*—the government has also admitted, full stop, to the material and exculpatory nature of the extensive evidence that the government willfully suppressed regarding the critical issue of "donations" versus "bribes"—evidence necessary, in the government's own words, to properly assess the critical issue of "intent."

b.    The Government Systematically Suppressed Exculpatory Evidence
       and Manufactured Inculpatory Evidence.

The government's suppression of evidence of payments in the nature of "donations," in

---

[1] Singer memorialized in his iPhone notes a "[l]oud and abrasive call" with government agents in October 2018 in which they "continue[d] to ask [him] to tell a fib" and "bend the truth" and "not restate what [he] told [his] clients as to where there [sic] money was going—to the program not the coach and that it was a donation." 10/2/18 Singer Note, Ex. A at 1. Special Agent Keating admitted in her affidavit accompanying the government's Sur-Reply that she was "more animated than usual" during her conversation with Singer. Keating Aff. ¶ 6.

favor of its preferred stark *criminal* articulation of payments in the nature of "bribes," played out repeatedly in Hodge's case and more broadly across the parent cases as a whole. The sections below, individually and collectively, set forth the specific means by which the government systematically suppressed exculpatory evidence of "donations" and "payments to universities and university programs," *and also manufactured evidence*, in order to eliminate—in violation of Constitutional requisites, this Court's Local Rules, and all principles of fairness and decency— any perceived room for doubt on the central question of intent that had so concerned the government for "new clients," but apparently mattered not at all to the prosecutors as they doggedly pursued Hodge and the other parent defendants "at all costs." *See* Ex. A at 1.

<ol type="i" start="9">
<li><u>*The Government's Misconduct Regarding the Nature of Payments to Loyola Marymount University ("LMU")*</u></li>
</ol>

In a particularly egregious instance of government misconduct on the question of "donations" versus "bribes," the government both suppressed exculpatory evidence *and* manufactured inculpatory evidence concerning the college application for Hodge's fifth child. The government first withheld material information favorable to the defense regarding Hodge's contemplated payments to LMU, and then *altered* that evidence and presented it to this Court, and to the defense, as starkly *inculpatory* evidence when, in its original, unaltered form, the evidence was *exculpatory*. With an objective to drive a harsher sentence for Hodge, the government pressed this Court to consider evidence that Hodge had attempted a fifth "bribe" to an LMU assistant basketball coach. The government presented this asserted evidence repeatedly:

- In correspondence to Hodge's defense counsel, the government stated that Singer had told the government that he, Singer, had planned to keep Hodge's money for himself, but had implied to Hodge that a "payment **to the LMU coaches** would be necessary to secure [his fifth child's] admission." 1/24/20 Letter, Ex. B.

- The government represented in its statement of offense conduct submitted to Probation on November 7, 2019, that "Hodge attempted to pay an additional $250,000 to an [**LMU**] **assistant basketball coach** to facilitate the admission of another one of his

children," *see* PSR at 15, and that "Hodge conspired to pay $250,000 to pay an *LMU assistant basketball coach*, Jeff Strohm, to facilitate the admission of Hodge's [fifth child]. . . to LMU," *see id.* at 26.

- In its written sentencing submission to this Court, the government stated that Hodge "*sought unsuccessfully to use bribes to secure the admission of a fifth child to Loyola Marymount University ('LMU')*." Gov't Sentencing Memo, Dkt. No. 816 at 3.

- In its oral presentation at sentencing, the government stated that Hodge "agreed to make a 200,000 to $250,000 payment if Singer's insider at LMU, or Loyola Marymount, could secure his son's admission." Sentencing Tr. at 23.

The government made these representations while withholding the evidence in its possession that Singer had directly told the government that, while he planned to keep Hodge's money for himself, he had conveyed to Hodge that his payments would be going "to *LMU*"—*not* to an individual coach, but to the University itself. *See* 11/1/18 FD-1023, Ex. C at 3. The government's falsification of the underlying evidence is starkly revealed by a comparison of the above on-the-record representations with the suppressed statement as it appears in the FBI 302. The underlying statement as recorded in the FBI 302 made no mention of payments to an individual coach and instead referred exclusively to money going *to the university itself.* The FBI 302 states: "[Singer] does not have to pay anyone at LMU and will keep the money for himself. . . . [Singer] implied to Hodge that the money will be going to LMU." *Id.* As a close review of the statements in question makes clear, the prosecution took the exact same sentence from the exact same FBI 302 and changed it from an accurate and exculpatory statement bearing on Hodge's intent— namely, that Singer had implied to Hodge that his payments would be going *to the university*— into a false and cleanly inculpatory statement—namely, that Singer had implied to Hodge that his payments would be going *to the LMU coaches,* or specifically *to the LMU assistant basketball coach.*

The government's clear and repeated presentation of this false inculpatory evidence, created by literally re-writing the evidence, cannot be explained by oversight: first, the statement

was *affirmatively re-written*; and, second, as set forth below, the government's creation of false inculpatory evidence regarding Hodge's payments to LMU is part of a broader pattern of government manipulation of the factual record to fit its  preferred theory that Hodge and the other parents were knowingly and intentionally engaging in black-and-white bribery—specifically, making payments to bribe coaches individually and to line their pockets personally. The newly disclosed evidence and the government's admissions in its Sur-Reply show that the government pursued this strategy systematically in order to darken the nature of the conduct, making it appear to be clearly and unambiguously criminal, while simultaneously suppressing all evidence to the contrary.

The repeated false and misleading representations by the prosecution team, in violation of the government's obligations under *Brady* and the Local Rules and its duty of candor before the Court, caused severe prejudice to Hodge. With the government suppressing the accurate, exculpatory statement that Singer had implied to Hodge that his payments would be going "to *LMU*," the Court accepted the prosecutor's representations that Hodge was knowingly and intentionally making bribe payments to the LMU assistant basketball coach, and stated at the time of imposing sentence: "You spent $850,000 *bribing college officials*, and that amount would have exceeded $1 million if the folks at Loyola Marymount hadn't resisted the overtures of your co-conspirator." Sentencing Tr. at 63; *Cf. Severson*, 3 F.3d at 1005 (ordering a re-sentencing where the government suppressed evidence bearing on a factor that the court had expressly addressed at sentencing).

ii. *At the Time of Hodge's Sentencing Proceedings, the District Court Had Already Underscored for the Government the Material Importance of the Distinction between Donations and Bribes.*

Notably, the critical distinction between donations and bribes is one that Judge Woodlock

specifically addressed with the government during the October 30, 2019 sentencing proceeding for Jeffrey Bizzack, as the distinction pertained to Bizzack's state of mind and relative culpability. The Bizzack sentencing proceeding *preceded* the Hodge sentencing proceeding by more than three months, eliminating any credible argument that the government was unaware of the relevance and materiality of the distinction—and therefore also the relevance and materiality of the evidence it was withholding—at the time of Hodge's sentencing (as now also confirmed by the government's admissions in its Sur-Reply). Judge Woodlock focused intently on this distinction as a matter of high importance, and pressed the government for the specific facts on this precise question as he sought to impose punishment commensurate with the defendant's conduct.

In response to Judge Woodlock's pointed factual inquiry—and while withholding from the Court the evidence in its possession that Bizzack believed his payments were going to the University of Southern California ("USC") or to a University program—the prosecutor represented to the court that Bizzack had understood that his payments were going directly to a university employee for her personal benefit. Specifically, the evidence in the government's possession, undisclosed to Judge Woodlock, was that "*[Bizzack] believed the money paid was going to the program or to USC.*" *See* 12/12/18 FD-1023, Ex. D at 1. At Bizzack's sentencing proceeding, however, the government represented the exact opposite. Specifically, Judge Woodlock pressed the government prosecutor: "I want to get the specifics of the facts here. . . . So I'm supposed to draw [the inference] . . . that *[Bizzack] knew that this was going to Ms. Heinel for her own personal use?*" *See* Bizzack Sentencing Tr., Ex. E at 22. The Assistant United States Attorney representing the government, Kristen Kearney, answered "Yes," explaining that Bizzack understood that Heinel would be receiving the funds for her own personal use because the funds were going to a particular

14

account at her direction. *See id.* [2]

Accordingly, in strikingly similar fashion, in two separate proceedings before two district court judges, prosecutors on the same government prosecution team made false and misleading representations to the Court that defendants Bizzack and Hodge knowingly and intentionally made black and white "line the pockets" bribe payments to individual university personnel while withholding material evidence directly refuting their representations to the Court. After being intently pressed by Judge Woodlock on the precise question of bribes versus donations during Bizzack's sentencing proceeding, the government can have no explanation—other than deliberate wrongful conduct—for its behavior in misrepresenting the LMU payment facts before this Court. This repeated, affirmative, substantively parallel misconduct, now accompanied by the government's admission of its then-appreciation for the critical nature of this very distinction—reflects not careless error before the Court, but rather intentional and deliberate misconduct.

        iii.    *The Government's Broader Suppression of Evidence Pertaining to the Critical Distinction Between Donations and Bribes Further Confirms the Pattern of Deliberate Government Misconduct in this Case.*

Further confirming that the government's false representations to the Court were not accidental or isolated misrepresentations—but rather part of a broader pattern of conduct designed to obscure the more ambiguous and benign aspects of the defendants' conduct in favor of a crisp, easily digestible picture of stark criminality—the government systematically failed to disclose numerous items of material evidence reflecting that Hodge (and other parents such as Bizzack) understood and believed their payments to be in the nature of donations to universities and university programs. As reflected in Judge Woodlock's statements during the sentencing

---

[2] Eric Rosen, the lead prosecutor on this case, was at counsel table during this proceeding and did not correct Kearney's misrepresentation. *See* Bizzack Sentencing Tr., Ex. E at 2 (listing attorney appearances).

proceeding for Bizzack, there is an important difference in state of mind and relative culpability between (i) knowingly paying a bribe to line the pockets of a university employee, and (ii) knowingly making a donation to a university or university program with the understanding that the payment is for the university's benefit. By withholding numerous items of evidence—across multiple parent cases—reflecting parents' understanding that the payments were going to the universities as donations and not as payments to coaches or other university personnel, the government sought to elide this distinction and present Hodge's conduct, and that of other parent defendants, as black-and-white bribery.

The withheld evidence on this critical point is multifold, and its suppression cannot be explained by mere oversight or mistake. In addition to the exculpatory evidence referenced above, the government kept in its sole possession further exculpatory evidence bearing on the nature of payments by Hodge and other parent defendants, including but not limited to:

- Notes from Singer's iPhone memorializing Singer's "[l]oud and abrasive call" with government agents in October 2018 in which they "continue[d] to ask [him] to tell a fib" and "bend the truth" and "not restate what [he] told [his] clients as to where there [sic] money was going—*to the program not the coach and that it was a donation*," 10/2/18 Singer Note, Ex. A at 1;

- Evidence reflecting Singer's own understanding that payments made to Georgetown University tennis coach Gordon Ernst would be going "*to the tennis program*"—*not* to Ernst for his personal benefit, 9/26/18 FD-1023, Ex. F at 7;

- Evidence that Ernst told Singer that he could "*make a donation to the program* for a tennis spot, even if the student was not a tennis player," 9/21/18 FD-1023, Ex. G at 3;

- Statements from USC assistant soccer coach Laura Janke that Heinel told her that (i) "kids' families give money to development," that (ii) according to USC admissions, "*if someone can help a program and team, it was ok*," and that (iii) *Heinel had "gone through steps to make sure this was ok*," 3/25/19 Janke 302, Ex. H at 8;

- Singer's statements to the government that "*[i]nitially all the payments to USC went to the programs*," 9/21/18 FD-1023, Ex. G at 3;

- A video from Singer's presentation to Starbucks executives in June 2018, in which Singer promotes the "side door" as a benign way to secure admission to universities through "*institutional advancement*" for "one tenth of the money"—*with no reference to bribery* or criminality, 6/18 Video Tr., Ex. I;

- The government's statement in its Sur-Reply that Singer was resistant to using the language of bribes or bribery because "*he had already told [the parents] that their money would go to an athletic program*, not a coach," Dkt. No. 1104 at 5, and that Singer was "*particularly resistant" to telling parents that "the money was a payment to a coach, because that was not what he had told them previously*," *id.* at 8; Keating Aff. ¶ 9 (Singer "usually told his clients that *the money was a donation to an athletic program*"); Smith Aff. ¶ 9 (same); Rosen Aff. ¶¶ 6-7 (same); 4/24/20 Singer 302, Dkt. No. 1104-4 at 1-2 (same).

The government withheld all of this highly exculpatory evidence—including the exculpatory evidence that only emerged last Friday in response to this Court's directive to the government to file its Sur-Reply—while representing to this Court, an overwhelming number of times throughout the sentencing proceedings, that Hodge had engaged in black and white, "line the pockets" bribery:

Statement of Offense Conduct in PSR:

- "Hodge conspired . . . *to bribe four employees* of Georgetown and USC. . . . Hodge attempted *to pay an additional $250,000 to [an LMU] assistant basketball coach* to facilitate the admission of another one of his children." *See* PSR at 15.

- "Hodge made this $75,000 payment *as an initial bribe to Ernst* for facilitating [Hodge's eldest daughter's] admission to Georgetown as a purported tennis recruit." *Id.* at 18.

- "Hodge made this second $75,000 payment *as a final bribe payment to Ernst* for facilitating [Hodge's eldest daughter's] admission to Georgetown as a purported tennis recruit." *Id.*

- "Hodge ultimately conspired to pay $175,000 *to bribe Ernst* to designate Hodge's [eldest] son . . . as a recruit to the Georgetown tennis team." *Id.*

- "Initially, . . . Hodge conspired with Singer *to bribe basketball coaches* to have [Hodge's eldest son] admitted as an athletic recruit to Vanderbilt." *Id.*

- "Hodge made this initial portion of the *$175,000 bribe payment* in exchange for Ernst facilitating [Hodge's eldest son's] admission to Georgetown as a purported tennis recruit." *Id.* at 20.

- "Hodge conspired to pay $200,000 *to bribe USC head women's soccer coach* . . . and USC assistant women's soccer coach . . . to designate his [younger] daughter . . . as a recruit to the USC women's soccer team." *Id.*

- "Hodge wired *$200,000 in bribe payments* . . . in exchange for . . . Janke and Khosroshian facilitating [Hodge's younger daughter's] admission to USC as a purported soccer recruit." *Id.* at 22.

- *"**Hodge conspired to pay $325,000 to bribe USC Senior Women's Administrator Donna Heinel** to designate [Hodge's younger son] . . . as a recruit to the USC football team." Id.* at 23.

- "Hodge caused a $75,000 check made payable to the 'Women[']s Athletic Board' to be mailed to Heinel *as a bribe payment* in exchange for facilitating [Hodge's younger son's] admission to USC as a purported football recruit." *Id.* at 25.

- "Hodge also wired *bribe payments of $125,000* to The Key and $125,000 to KWF." *Id.*

- "Hodge conspired to pay *$250,000 to pay an LMU assistant basketball coach* . . . to facilitate the admission of Hodge's [fifth child] to LMU. Hodge . . . *also considered bribing USC employees* to have [him] admitted as an athletic recruit." *Id.* at 26.

Government's Sentencing Memorandum:

- "Over nearly 11 years, [Hodge] engaged co-conspirator William 'Rick' Singer five separate times, *successfully employing bribery and fraud* to secure the admission of [his children]." Dkt. No. 816 at 1.

- "[Hodge] *paid bribes* . . . *to facilitate [his] children's admission* to elite colleges and universities." *Id.* at 3.

- "Hodge engaged in the scheme more often, and over a longer period of time, than any of the defendants charged to date, *paying bribes totaling $850,000*, over more than a decade, to secure the admission of two children to USC and two children to Georgetown. He also *sought unsuccessfully to use bribes* to secure the admission of a fifth child to Loyola Marymount University ('LMU')." *Id.* at 3.

- "After his son was admitted to Georgetown, Hodge sent Ernst *another $175,000 bribe*." *Id.* at 4.

- "Hodge agreed to pay $325,000 *to bribe Donna Heinel*, a senior administrator of women's athletics at USC, in exchange for admitting his second son as a purported football recruit." *Id.* at 5.

- "[H]e *sent bribes directly to Ernst*, the Georgetown tennis coach." *Id.* at 20.

Government's Oral Presentation at Sentencing:

- "Five times over close to 11 years, [Hodge] sought to steal admissions spots from three Universities *by way of frauds and bribes.*" Sentencing Tr. at 21.

- "*It required fraud and bribes*. That's why, on a later call, Hodge agreed to make a 200,000 to $250,000 payment if Singer's insider at LMU, or Loyola Marymount, could secure his son's admission." *Id.* at 23.

- "And as Hodge recounted in a recorded call, although the two didn't talk money, he and Heinel were, 'kind of talking in code' about *the $75,000 bribe Hodge would later pay* at Heinel's directive after she secured his son's admission." *Id.* at 29.

This pattern of making false and misleading representations to this Court while withholding

18

contrary evidence—including *after* Judge Woodlock had underscored for the government the materiality of this evidence in fashioning a just sentence calibrated to the defendant's conduct—cannot be excused. The government's misconduct was repeated, systematic, deliberate, and highly prejudicial to Hodge.

Indeed, without any contrary evidence as a reference point, and as with the LMU-specific evidence, this Court accepted the government's representations of knowing and intentional bribery of individual university personnel and stated at the time of sentencing that "Hodge's objective in this case was to obtain admission to the University of Southern California and Georgetown for four of his children *by bribing college administrators* to admit students who otherwise would not have been admitted," *id.* at 5, while condemning Hodge for his role in the "*systematic pervasive bribery of college officials* to get [his] kids into college," *id.* at 63.

> 2.      The Government Represented the Universities as Victims of Singer's Fraudulent Scheme and Withheld Evidence to the Contrary.

To complete its preferred articulation of defendants' conduct as black-and-white, "line the pockets" bribery, the government systematically presented the universities as v*ictims of bribery* to this Court while suppressing evidence that at least one of the universities involved was a *solicitor and beneficiary of donations*. In so doing, the government repeatedly cast the universities as wholly duped by Singer's fraudulent scheme:

- "There can be little dispute that the universities . . . *have suffered, and will continue to suffer, pecuniary harm*." Sentencing Memo, App. B, Dkt. No. 816 at 2.
- "[T]he fraud scheme *deprived the victim universities* of the full value of the salaries they paid the corrupt employees." *Id.* at 4.
- "[Hodge's] crime caused . . . individualized harm, *inflicting financial and reputational harm on the universities [he] targeted*." Sentencing Memo, Dkt. No. 816 at 19.

The government made these representations while suppressing contrary evidence in its possession that paints a far more ambiguous picture, undermining the government's fraud theory:

- Statements from a former university assistant soccer coach that Heinel told her that (i) "kids' families give money to development," that (ii) according to university admissions, "*if someone can help a program and team, it was ok*," and that (iii) ***Heinel had "gone through steps to make sure this was ok*,** 3/25/19 Janke 302, Ex. H at 8;

- Statements from a former university sports administrator that "[w]ith regard to exchange of money in order to accept a walk-on, it depended on the walk-on. A lot of people want to help kids find a college and get them into school. ***Having someone pay to help a student get into college wasn't wrong***," 1/24/19 Lopes 302, Ex. J at 5;

- Evidence that the father of a university golf recruit "***paid $3 million dollars to get [his son] into***" the university through a "deal" negotiated by the university's former athletic director, 6/28/19 Khosroshahin 302, Ex. K at 3.

Rather than muddy its preferred theory that Hodge had bribed university employees at the *university's expense*, the government systematically withheld the above evidence suggesting payments in the nature of donations for the *university's benefit* and *with the university's blessing*. Consistent with Judge Woodlock's statements during Bizzack's sentencing proceeding, there is a critical distinction between (i) universities being duped by bribed employees and (ii) universities seeking and accepting donations in connection with the admissions process—a distinction that the government itself had recognized, but once again sought to elide by suppressing exculpatory evidence; namely, evidence of university participation in the knowing acceptance of donations in exchange for favorable admissions consideration in the context of athletics. In suppressing this evidence of university participation, while at the same time presenting the institution as the victim of unlawful bribe payments to its personnel, the government further embellished its false and misleading presentation of clearly criminal bribery misconduct by matching this theory with a "victim" that, in the government's incomplete presentation of the evidence, bore no trace of willing participation or affirmative condoning of donations for favorable consideration.

\*          \*          \*

This Court made clear at sentencing that "the impact of Mr. Hodge's criminal conduct and the unique circumstances of this crime . . . [would] determine the ultimate sentence imposed."

Sentencing Tr. at 15. The categories of suppressed and manufactured evidence set forth above bear directly on the "impact" of Hodge's conduct and the "unique circumstances of this crime." The government's repeated, deliberate, and systematic misconduct in this case warrants a re-sentencing proceeding for Hodge to ensure that the fairness and integrity of his sentencing proceeding, and the interests of justice, have been respected.

###### C.   The Government's Misconduct Infected Hodge's Plea Proceedings and Rendered His Plea to the Money Laundering Charge Involuntary.

The government has a duty to uphold principles of fairness in plea negotiations and to refrain from impermissible conduct undermining the voluntariness of a plea. The government breached this duty in the lead up to Hodge's plea by engaging in misconduct that impermissibly interfered with Hodge's decision to plead guilty. While Hodge accepts responsibility for his conduct giving rise to the fraud conspiracy charge, his plea of guilty to the money laundering charge—a charge that is legally and factually unsustainable—was entered involuntarily for the reasons discussed below and should be set aside.

###### 1.   Factual Background

At the time of Hodge's plea, the government was continuing to suppress all of the exculpatory evidence catalogued above regarding Hodge's understanding that he was making donations to universities and not bribes to individual coaches. The government was doing so notwithstanding (i) Hodge's and the other defendants' repeated requests for this specific information, *see supra* at 3, and (ii) the government's recognition and awareness, *at that time*, of the exculpatory nature of this evidence, *see supra* at 8-10. Even after Judge Kelley urged the Government, at a status conference in June 2019, to turn over information if the defense had provided "any arguable reason" that it was exculpatory, *see supra* at 3, the government failed to do so, depriving Hodge, at the critical juncture of his plea proceedings, of material, exculpatory

evidence bearing on the government's charges and his defenses thereto.

When plea discussions commenced in October 2019, the government made explicit that, if Hodge did not plead guilty to the pending charges, he would be charged with federal program bribery under 18 U.S.C. § 666. The § 666 charge was a charge that, Rosen reported, the U.S. Attorney "wants." McPhee Decl. ¶ 2. The charge carries a dramatically harsher sentencing structure than the one adopted by the Court under 18 U.S.C. § 1349—a sentencing structure that would have ratcheted up Hodge's exposure under the Sentencing Guidelines, for the same underlying conduct, from the zero-to-six months range to a range of 97 to 121 months in prison. This Sentencing Guidelines disparity was expressly highlighted by the government. In a meeting on October 14, 2019, Rosen told counsel that Hodge was "on the cusp of 666," that the superseding indictment with the § 666 charge would be returned "very, very soon," and that, "in a week, [the Guidelines get] worse." Geggel Decl. ¶ 2. During these discussions, the government pressed upon Hodge, as the sole avenue for him to avoid the threatened consequences, a take-it-or-leave-it, across-the-board plea to the fraud conspiracy charge *and* conspiracy to commit money laundering.[3] *Id.* ¶ 3. When counsel raised with Rosen the legal invalidity of the money laundering charge, he responded that unless Hodge pleaded to both the fraud and money laundering conspiracies, he would be included in the superseding indictment expected to be returned six business days later, on October 22, 2019. *Id.* ¶ 4.[4]

---

[3] Hodge agreed to an "open" plea because the government's alternative offers were wholly unacceptable: either a binding plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) with a range of 12 to 30 months of imprisonment *or* a plea pursuant to Rule 11(c)(1)(B), which was contingent on Hodge agreeing to the government's incorrect Guidelines range calculation of 37 to 46 months. Geggel Decl. ¶ 5.

[4] Consistent with the government's accelerated timeline for Hodge to enter his plea to both the fraud conspiracy and the money laundering charge, or face the threatened consequences, the superseding indictment was returned eight days later, on October 22, 2019, as the government had

2.      The Suppression of Exculpatory Evidence Prejudiced Hodge in his
Decision Whether to Enter a Guilty Plea on the Terms Set by the
Government.

Hodge was severely compromised in his decision-making regarding whether to enter a guilty plea by the government's suppression of material evidence bearing not only on his intent, but also on the force of the threats the government was levelling against him to get him to plead guilty. The government's unlawful suppression of this evidence was highly prejudicial to Hodge. Had this evidence been timely produced consistent with the government's obligations under *Brady* and the Local Rules and Judge Kelley's directive, it would have factored directly into Hodge's calculus in deciding whether to plead guilty and, specifically, whether to plead guilty to the money laundering charge.

Had the suppressed evidence been timely disclosed, it would have undermined both the threatened § 666 federal program bribery charge and the pending money laundering charge, simultaneously reducing for Hodge the perceived threat of § 666 while reinforcing and strengthening his assessment that the money laundering charge was factually and legally unsustainable. Both charges rely on a government theory of knowing and intentional *bribe* payments by Hodge—a factual predicate that would have been undercut by the suppressed evidence that Hodge understood his payments to be *donations* to universities and not bribes to individual university personnel. Both charges similarly rely on a government theory that *individual coaches or university officials* were the bribe recipients—a factual element that would have been undermined by disclosure of the evidence that Donna Heinel, the alleged bribe recipient at USC, was not a participant in Singer's fraudulent scheme at the time of Hodge's payments and was accepting funds not for her own personal benefit, but rather on behalf of the university and with

previewed. *See* Dkt. No. 610. Hodge entered his guilty plea to the then-pending indictment the day before the superseding indictment was returned. *See* Dkt. No. 595.

the reported blessing of the university. *See supra* at 16, 19. In addition, the suppressed evidence would have changed Hodge's calculus with regard to challenging the legal invalidity of the money laundering charge. Specifically, the suppressed evidence would have highlighted the absence, at the time of the alleged money laundering transaction, of any distinct financial transaction involving the proceeds of specified unlawful activity, as required by First Circuit precedent. *See infra* at 27 & n.7.

### 3.   Hodge's Plea to the Money Laundering Charge Was Involuntary.

To set aside his plea to the money laundering charge, Hodge must make two showings: (1) "egregiously impermissible conduct," such as threats or misrepresentations by the government; and (2) "the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." *Ferrara*, 456 F.3d at 290. Both prongs are satisfied here.

### a.   The Government's Misconduct in the Lead Up to Hodge's Plea Was Sufficiently Egregious to Render the Plea Involuntary.

A plea is rendered involuntary when the government's failure to reveal exculpatory evidence is combined with "some particularly pernicious form of impermissible conduct," including threats and misrepresentations. *Id*. at 291. Here, not only did the government suppress— and affirmatively deny knowledge of—key evidence in the lead up to Hodge's plea, but it also employed highly coercive tactics, aggravated by the very information it withheld from Hodge. As such, "the prosecution's failure to disclose evidence [is] sufficiently outrageous to constitute the sort of impermissible conduct that is needed to ground a challenge to the validity of" the plea. *Id.*

The government's threshold misconduct lay in suppressing exculpatory information. *See supra* at 22-24. Beginning as early as October 2018, and continuing thereafter, Singer made numerous statements to the government prosecutors and agents that he had advised parents that their payments were going to the universities or university programs. *See supra* at 16. Singer's

statements threatened to undermine a central theory of the government's case—namely, that the parents had knowingly and intentionally paid bribes to individual university personnel. Recognizing the exculpatory nature of Singer's statements on the critical issue of the parents' "intent," *see supra* at 8-10, the government deliberately set out to suppress this evidence, and did so systematically. As the court found in *Ferrara*, where the government fails to disclose an integral witness's statements on a key government theory, the government's suppression cannot be "palmed off as mere inadvertence (or even as slipshod performance)." *See* 456 F.3d at 292. Rather, where the government has knowledge of key witness statements bearing on a central theory of the case, as here and as in *Ferrara*, that knowledge "trigger[s] [its] obligation to disclose the evidence," and its breach of those obligations undermines the voluntariness of the plea. *See id.* at 292-93.

The government's misconduct in this case extended beyond the unconstitutional suppression of exculpatory evidence in violation of *Brady*. First, the government affirmatively denied, before Judge Kelley and the defense, *any knowledge* of materials subject to disclosure under *Brady* and the Local Rules, notwithstanding that it then had extensive evidence in its possession that it had already affirmatively recognized to be exculpatory. In so doing, the government "plainly and inexcusably misrepresented the true state of affairs" at the time of Hodge's plea. *See id.* at 293. Second, rendering the government's misconduct still more "pernicious," the prosecutors engaged in coercive tactics that capitalized upon and exacerbated their *Brady*-related wrongdoing. Specifically, and in order to get him to plead, the government threatened Hodge with the far harsher sentencing structure, for the same underlying conduct, that would attend the impending federal program bribery charge if he did not immediately plead, within a matter of days, to the pending charges, all while suppressing the evidence that Hodge had

understood his payments to be donations and not bribes.[5] The government made clear that the only way for Hodge to avoid the consequences it had outlined was to plead, on a take-it-or-leave-it basis, to multiple charges, including the unfounded charge of money laundering.[6]

As such, this is not a case where the government merely "refus[ed] to render the whole of its case transparent before a defendant makes [his] election." *Ferrara*, 456 F.3d at 291. Rather, Hodge's misapprehension resulted from the "particularly pernicious" misconduct detailed above, where the government sought to capitalize on the glaring information imbalance it had itself created, using facts the government asserted to be unambiguously true, while withholding evidence to the contrary, in order to coerce and threaten Hodge into pleading guilty. *See id.*

> b.     The Government's Misconduct Caused Hodge to Plead Guilty to the Legally Invalid Money Laundering Charge.

With regard to the second prong under *Ferrara*, the "elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession." 456 F.3d at 294. A guilty plea is "personal" and "unique" and, therefore, when determining prejudice, it is important to "ascertain whether the totality of the circumstances discloses a reasonable probability that the defendant would not have pleaded guilty absent the misconduct." *Id.*

For the reasons set forth above, Hodge unequivocally would have altered his decision to

---

[5] The federal program bribery charge relies on Hodge's intent to "influence or reward an *agent*" of a university. *See United States v. Fernandez*, 722 F.3d 1, 17 (1st Cir. 2013) (emphasis added).

[6] As a further example of improperly withheld exculpatory information, the government recently disclosed that Singer did not believe—until the government and his attorney convinced him otherwise—that it was unlawful to facilitate donations to universities in connection with students' applications. *See* 4/24/20 Singer 302, Dkt. No. 1104-4 at 2. This withheld information bears on the government's ability to sustain a money laundering charge, as a core element of the offense requires knowledge that the proceeds were from "some form of unlawful activity." *See United States v. Misla-Alarondo*, 478 F.3d 52, 68 (1st Cir. 2007).

plead guilty in the absence of the government's egregious misconduct. The government used the imminent threat of § 666, the glaring information imbalance created by its *Brady* and Local Rules violations, and related coercive tactics, to erode Hodge's resistance and overcome his will. S*ee supra* at 21-22. The prejudice to Hodge is clear. But for the government's impermissible conduct, Hodge never would have pleaded to the specific all-or-nothing terms that included the legally invalid money laundering charge.[7]

## CONCLUSION

For the reasons set forth above, this Court should grant Hodge's motion for a re-sentencing proceeding, and for an order setting aside his plea to the money laundering charge.[8]

---

[7] Hodge's understanding of the legal invalidity of the money laundering charge was well-founded. A key element of the crime of money laundering is that a defendant knowingly engage in a financial transaction involving funds that are the proceeds of a "specified unlawful activity." *Misla-Aldarondo*, 478 F.3d at 68. The money laundering charge in this case is legally invalid for the simple reason that the conduct alleged in the Indictment does not involve any such proceeds of specified unlawful activity. Specifically, Hodge is alleged to have participated in a fraud scheme pursuant to which he made bribe payments to university personnel in connection with the college admissions process for his children. It is undisputed, however, that the funds Hodge used in connection with the scheme were the proceeds of his lawful employment. His use of that "clean" money to engage in the unlawful activity alleged in the Indictment does not give rise to a second crime of money laundering. Because the Indictment does not allege that Hodge engaged in any further financial transaction with the proceeds of that unlawful activity, there is no alleged conduct that could support a money laundering charge. As the First Circuit has affirmed, "the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime." *United States v. Richard*, 234 F.3d 763, 769 (1st Cir. 2000).

[8] Courts may set aside just one count of a multi-count guilty plea where circumstances emerge post-sentencing that undermine the voluntariness of a particular count. *See Ferrara v. United States*, 384 F. Supp. 2d 384 (D. Mass. 2005), *aff'd*, 456 F.3d 278 (1st Cir. 2006).

Dated: May 1, 2020                     Respectfully submitted,

By: /s/ Brien T. O'Connor
  Brien T. O'Connor (BBO #546767)
  *brien.o'connor@ropesgray.com*
  Ezra D. Geggel (BBO #691139)
  *ezra.geggel@ropesgray.com*
  ROPES & GRAY LLP
  Prudential Tower
  800 Boylston Street
  Boston, MA  02199
  Phone: (617) 951-7000

  Joan McPhee (BBO #547869)
  *joan.mcphee@ropesgray.com*
  ROPES & GRAY LLP
  1211 Avenue of the Americas
  New York, NY  10036-8704
  Phone: (212) 596-9000

  Miranda Hooker (BBO #661569)
  *hookerm@pepperlaw.com*
  PEPPER HAMILTON LLP
  125 High Street
  Boston, MA  02110
  Phone: (617) 204-5100

  *Attorneys for Defendant Douglas Hodge*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2020, I filed the foregoing with the United States District Court for the District of Massachusetts using the CM/ECF system, and caused it to be served on all registered participants via the notice of electronic filing (the "NEF").

Dated: May 1, 2020

/s/ Brien T. O'Connor
Brien T. O'Connor