UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG-11 |
| | ) | |
| (11) DOUGLAS HODGE, | ) | *Leave to File Granted:* |
| | ) | *May 29, 2020* |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT DOUGLAS HODGE'S MOTION
FOR RELIEF PURSUANT TO 28 U.S.C. § 2255 (DKT. 1143)**

On October 21, 2019, defendant Douglas Hodge pled guilty to one count of conspiracy to commit mail and wire fraud and honest services mail and wire fraud and one count of conspiracy to commit money laundering. *See* Dkt. 606. On February 7, 2020, this Court sentenced Hodge to nine months' imprisonment. *See* Dkt. 840. Hodge now seeks to withdraw his plea to money laundering conspiracy, and to be re-sentenced on the remaining count, contending that the government failed to produce exculpatory materials prior to sentencing and misled the Court by describing his conduct as bribery.

Hodge's motion is without merit and his factual contentions are demonstrably untrue, belied by among other things his own sworn statements to this Court and his statements to government investigators. Alone among the defendants who have appeared before this Court, Hodge passed bribes directly to Gordon Ernst, the coach of the Georgetown University ("Georgetown") tennis team, making the checks payable to Ernst personally and mailing them to his home. Against that backdrop, his contention that evidence "regarding the distinction between 'donations' and 'bribes'" was exculpatory as to him "because of its direct bearing on the central question of criminal intent in this case" (Def. Br. at 2), is frivolous. Later, as the scheme evolved, Hodge *also* made payments, styled as "donations," to the University of Southern California ("USC") and to a sham charitable foundation operated by his co-conspirator, William "Rick"

Singer—with the understanding that those payments, too, would induce one or more USC insiders to facilitate the fraudulent admission of his children as athletic recruits based on falsified credentials.   Those facts have been clear since the inception of this case, were disclosed by the government in the earliest charging documents and discovery materials, and have been repeatedly acknowledged by Hodge and his counsel, including in open court.

Hodge's motion is stunning in its effort to minimize and evade responsibility for the crimes he committed. He speaks euphemistically of "helping his children obtain favorable consideration," and knowing that "Singer was providing his children with a false athletic brand." (Def. Br. at 1.) But Hodge's crime involved neither of those things.  Hodge paid bribes, to individuals and to university athletic programs, to have his children recruited as athletes when they were not.  The Hodge children did not "obtain favorable consideration."  Hodge *stole* admission slots for them from deserving applicants using illegal payoffs.  Singer did not, *sua sponte*, provide Hodge's children with a "false athletic brand."  Hodge *conspired* with Singer to *fabricate* their credentials and impersonate real athletes. This is not "branding." It is fraud, and Hodge stands rightly convicted of two federal felonies because of it.

For these reasons, and the reasons set forth below, Hodge's contention that the government concealed information from him and from the Court that bears on his intent and culpability is flatly untrue, and his motion should be denied without a hearing.

## FACTUAL BACKGROUND

### A.  Hodge's Five "Side Doors"

In or about 2007 and 2008, Hodge agreed with Singer to pay $325,000 to Ernst, the Georgetown tennis coach, in exchange for having Ernst designate two of Hodge's children as tennis recruits to secure their admission to Georgetown.  Specifically:

- In late 2007 and early 2008, Singer discussed with Hodge using fraudulent athletic credentials, and a payment, styled as a "donation," to "certain areas of a university," to secure his daughter's admission to college. *See* Ex. A [Dec. 4, 2007 email]; Ex. B [Feb. 25, 2008 email]. Singer made clear that Hodge would not make any payment until his daughter received a "likely letter" confirming her conditional admission as a recruited athlete. *See* Ex. C [Jul. 26, 2008 email].

- In November 2008, Hodge's daughter's application was submitted to Georgetown, falsely describing her as a high-level competitive tennis player. *See* Ex. D [Georgetown application]. Hodge acknowledged knowing that the application essay contained falsified tennis accolades and that her admission as a tennis recruit had to "stay under the radar." *See* Ex. E [Nov. 18, 2008 and Feb 22, 2009 emails].

- After his daughter was admitted to Georgetown as a purported tennis recruit, Hodge sent two separate payments of $75,000 to Ernst. *See* Ex. F [2009 Ernst payments]. Although Singer had previously described the scheme to Hodge as involving "donations" to the tennis program, Hodge made his checks payable to Ernst personally, and sent them to Ernst's home address. Hodge did not deduct the payments from his taxes as charitable donations.

- In 2010, Hodge did the same thing, this time for his son, paying $175,000 to Ernst personally to secure his son's admission as a purported tennis recruit, based on the false claim that he was "one of Japan's top youth tennis players." *See* Ex. G [2010 side door emails and payments].

In or about 2013, Hodge worked with Singer again to secure another daughter's fraudulent admission to USC. This time, Hodge did not make payments to any coaches directly. Instead, Hodge made the payments, totaling $200,000, to the Key Worldwide Foundation ("KWF"), Singer's purported charitable foundation, and The Key, Singer's for-profit company. Singer, in turn, forwarded some of the money to a private soccer club controlled by the two USC soccer coaches (and unaffiliated with USC). The scheme worked as follows:

- In 2013, USC soccer coaches submitted a falsified soccer profile for Hodge's daughter to the USC subcommittee for athletic admissions. *See* Ex. H [USC soccer profile]. Hodge's daughter was admitted to USC as a purported athletic recruit based on those false credentials.

- After USC mailed Hodge's daughter an acceptance letter, Singer directed Hodge to wire $150,000 to The Key, and $50,000 to KWF. Singer told Hodge: "looks like 150 will be an expense and 50 a donation." Hodge wired the money as directed. *See* Ex. I [2013 USC payment emails]. Singer then made payments from KWF to the private soccer club controlled by the USC coaches.

The following year, Hodge pursued the scheme a fourth time, this time to secure his son's fraudulent admission to USC. This time around, the price was higher, and the payments were structured somewhat differently. No money went to any USC insider personally. Instead, Hodge paid $250,000 to Singer, through his two entities, and $75,000 to a USC fund for women's athletics. In exchange, the administrator of that program, USC athletics administrator Donna Heinel, facilitated the purported recruitment of Hodge's son, as follows:

- Singer initially attempted to secure the admission of Hodge's son to USC as a purported basketball recruit, once again using falsified athletic credentials. *See* Ex. J [Dec. 20, 2014 email]; Ex. K [USC application]; Ex. L [Jan. 6, 2015 email]. When that failed, Singer created two additional fake profiles—one for football, and the other for tennis. Singer sent the profiles to Hodge, writing: "[W]e have stretched the truth but this is what is done for all kids. Admissions just needs something to work with to show he is an athlete. They do not follow up after Donna [Heinel] presents." *See* Ex. M [Jan. 30, 2015 email].

- Heinel presented Hodge's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—secured the subcommittee's approval to admit him as a purported football recruit. *See* Ex. N [Hodge subcommittee packet]. Singer then explained to Hodge: "I will need to take care of the different parties [who facilitated Hodge's son's admission] separately, which I will accomplish to finalize all the dealings. Once you receive the Acceptance please let me know so we can move forward financially." *See* Ex. O [Mar. 17, 2015 email].

- Later, Singer told Hodge: "USC called today. I am going to send several checks out Tomorrow through our accounts so they are happy. Below is the wiring instructions [to The Key and KWF] for the 250k we need to take care of the several folks at SC." *See* Ex. P [Mar. 30, 2015 email]. Hodge wired $125,000 to The Key and $125,000 to KWF, as directed. *See* Ex. Q [Apr. 3, 2015 email]. At Singer's direction, Hodge also sent a $75,000 check to the USC "Women's Athletic Board." *See* Ex. R [Apr. 15, 2015 email].

- In a consensually recorded telephone call on November 30, 2018, in which Singer, acting at the direction of federal agents, told Hodge that KWF was being audited and that Hodge's payments would come under scrutiny, Hodge acknowledged that the payments were a *quid pro quo* to secure his children's admission to USC as purported athletic recruits. Hodge told Singer not to worry about the IRS audit because he was not "going off script here." *See* Ex. S at 5-6 [Nov. 30, 2018 transcript].

In total, Hodge paid $850,000 to secure the admission of four of his children to USC and Georgetown as fake athletic recruits: $350,000 to Gordon Ernst personally, $275,000 to the Key, $175,000 to KWF, and $75,000 to a USC fund for women's athletics.

Hodge also sought, unsuccessfully, to use bribes to secure the admission of a fifth child to Loyola Marymount University ("LMU").   Specifically:

- In September 2017, Hodge and Singer discussed employing the scheme for Hodge's younger son.  Hodge told Singer that he was not sure he was "going to [go] down this path," but that if he did, he would need to have a "carefully worded conversation" with his son.  *See* Ex. T [Sept. 25, 2017 email].

- In November 2017, Singer emailed Hodge's son's transcripts to an LMU basketball coach. *See* Ex. U [Nov. 6, 2017 email].   Singer told Hodge:  "I am meeting with the LMU folks on Tuesday . . . .  We should speak to make sure we are on the same page as we were for your other kids."  *See* Ex. V [Jan. 3, 2018 email].

- Hodge's son later decided not to go to college right away.   But in the summer of 2018, Hodge revisited the scheme, telling Singer, "[W]e don't have to talk . . . in code. We know how this works."  *See* Ex. W at 9 [Aug. 10, 2018 transcript].

- The following month, Hodge and Singer again discussed the scheme, which Hodge described to Singer as "number five."  *See* Ex. X at 1 [Sept. 11, 2018 transcript].   They agreed that Hodge would pay $200,000 or $250,000.   Hodge sought confirmation that this payment would be tax deductible.

- In October 2018, Singer told Hodge:   "LMU is awaiting my next move.   My friends there will help."  *See* Ex. Y [Oct. 7, 2018 email].   Hodge replied:   "Okay.   Pls keep me posted."   Later that month, Singer sent Hodge's son's high school transcripts and SAT score to the LMU basketball coach, asking to "hopefully get your help with guiding his application through admissions."   *See* Ex. Z [Oct. 24, 2018 email].

- Singer then called the LMU basketball coach to discuss Hodge's son. *See* Ex. AA [Nov. 29, 2018 transcript].   The following day, Singer told Hodge: "[The LMU coach] is going to get this done. . . .   They asked a question of 'tell me more about this young man,' and [the LMU coach] is going to go and meet with the dean."   *See* Ex. S at 9.

- The scheme ultimately failed because Hodge's son's grades were insufficient to secure admission to LMU.   *See* Ex. BB [Dec. 18, 2018 transcript].

## B.  Post Indictment and Discovery

On April 9, 2019, Hodge was indicted on charges of conspiracy to commit mail and wire fraud and honest services mail and wire fraud and conspiracy to commit money laundering.   In May 2019, the government began producing discovery on a rolling basis.

At the initial status conference, counsel for a co-defendant requested, on behalf of all the defendants, that the government produce FBI 302 reports of witness interviews, noting that:   "[i]f

Rick Singer was telling other parents that the money that they were giving to [KWF] was going to go to the athletic programs, we think that's exculpatory." *See* Ex. CC at 10 [Jun. 3, 2018 transcript]. The government responded: "it simply doesn't matter whether the money went to a coach's program or whether it went to a—the coach's pocket directly. A bribe is simply a *quid pro quo* with the intent to defraud, and all the Defendants have been charged with that." *Id*. at 13. The government then suggested that the defendants "review the discovery and then we can meet, confer." *Id.* The Court agreed. *Id*. at 14.

In a joint status report filed in September 2019, the parties agreed to continue to meet and confer, with a particular focus on the defendants' *Brady* requests. *See* Dkt. 574 at 2-3. At an October 2, 2019 status conference, the government told the Court that it was continuing to produce discovery on a rolling basis, and the parties agreed to meet and confer about "open discovery issues" before the next status conference. *See* Ex. DD at 8, 10, 15-16 [Oct. 2, 2019 transcript].

### C. Plea Negotiations with Hodge

On September 24, 2019, the government filed a standalone superseding indictment charging a Canadian resident, Xiaoning Sui, with, among other things, conspiracy to commit federal programs bribery for agreeing with Singer to bribe the soccer coach at the University of California – Los Angeles in order to secure her son's fraudulent admission. *See United States v. Sui*, 19-CR-10082-DPW at Dkt. 14. Shortly after that indictment was unsealed, on October 11, 2019, Hodge's counsel approached the government about engaging in plea discussions, noting a concern that the government would soon supersede to add a federal programs bribery charge against Hodge and his co-defendants. At the time, Hodge's counsel was aware that discovery was incomplete and that the *Brady* issues discussed at the prior status conferences had not been resolved.

Counsel for Hodge and the government met on October 14, 2019. The parties discussed a possible plea to both counts of the Indictment pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), but did not reach an agreement.

Ultimately, Hodge broke off plea discussions and decided to plead guilty, without an agreement, to both counts of the Indictment provided the government agreed not to supersede with additional charges. *See, e.g.*, Ex. EE [Oct. 17, 2019 email].  The parties negotiated an agreed-upon statement of facts that focused on the USC-related conduct, and Hodge's counsel assured the government that Hodge could truthfully allocute to facts satisfying the elements of both offenses— including, specifically, by acknowledging that he conspired to pay bribes via payments to "specific programs at USC." *See* Ex. FF [Oct. 20, 2019 emails].

Hodge pled guilty on October 21, 2019.  *See* Ex. GG at 1 [Oct. 21, 2019 transcript].  At the hearing, Hodge admitted, under oath, that he had agreed to commit "mail and wire fraud and honest services mail and wire fraud through the payments of bribes as well as the submission of falsities as part of applications for admission to USC," and that he had conspired to commit money laundering by "funneling bribe payments" through The Key and KWF. *Id.* at 11, 14.  The statement of facts to which Hodge agreed included the following: "Hodge understood that some of the money would then be sent to specific programs at USC as a *quid pro quo* inducement to the employees responsible for managing those programs."  *Id.* at 12-13.

### D.  Post-Plea Attempts to Cooperate

Following Hodge's plea, he requested to meet with the government for a proffer interview to explore his possible cooperation.  *See* Ex. HH [Dec. 5, 2019 email].

Hodge met with the government on January 9, 2020.  He explained, among other things, as follows:

- Hodge's "understanding [was] that his donation would go to the tennis program at Georgetown," and that false "tennis accolades" were being added to his daughter's application. Singer directed Hodge to send the check to "Ernst's home," although Hodge believed the money was going to be used by the coach for "legitimate tennis purposes." Hodge knew that "this was not the normal process for making a donation to the school," and that mailing the payments directly to Ernst was "problematic." Hodge did not deduct the "donation" from his taxes, and viewed the arrangement as a *quid pro quo*." Hodge knew that no legitimate development officer made "promises like Singer made to Hodge about getting a kid into school" or would state that a "certain sum of money will get a kid into the school."

- A difference between the "side door" and "legitimate donations was that [with the side door] he did not pay money until the school provided the likely letter," and that Singer's "guarantee was that you did not pay unless your kid got in." Hodge knew "this was a *quid pro quo*," and that he was "operating outside the normal process for donations."

- After he began making "donations" to KWF, Hodge never asked Singer what he did with the money. Rather, Hodge "paid the money to KWF and Singer did what he wanted with it." Hodge knew that a coach would "benefit" in some way. Hodge knew "by inference that a coach was in on it." Hodge knew that Singer "was working with co-opted coaches in order to get the kids in."

*See* Ex. II [proffer report]; *see also* Ex. JJ [proffer agreement].[1]

**E.  Sentencing**

Following the proffer and prior to Hodge's sentencing, the government submitted a statement of offense conduct to the Probation Office that described the *quid pro quo* payments Hodge made to facilitate his children's admission to college as "bribes," regardless of whether they were directed to Ernst personally, one of Singer's entities, or a USC athletics program. Hodge did not object to this characterization, despite submitting other, extensive objections to the PSR.  *See* PSR ¶¶ 36–119.

---

[1] Hodge entered into a standard proffer agreement with the government providing that his statements would not be used against him, "except" to "rebut any evidence offered, or factual assertions made" on Hodge's behalf that are inconsistent with the proffer. *See* Ex. JJ. The government respectfully submits that Hodge's motion is inconsistent with his proffer statements for the reasons set forth herein, and that the statements may therefore be used to rebut those assertions.

In his own sentencing memorandum, Hodge explained that Singer had described the payments as "donations," and that Hodge understood that the money would support "programs" at the universities.  On page one of that brief, he wrote:

> [T]*he government's position is that Singer informed Doug that his payments would support programs at universities.*  And indeed, Doug allowed Singer to assure him that his money would be used to support programs at universities and – after Singer set up his charitable foundation – to benefit underprivileged student-athletes.  To be clear, *Doug knew that Singer was falsely representing his children as athletes and that his payments would serve as a quid pro quo inducement to university employees to participate in the fraudulent scheme.*  Doug is taking complete responsibility for his decisions that have resulted in his criminal conviction. But an important piece of the story is how Doug comforted himself in his mistaken belief that he was also supporting educational institutions and helping students who were less fortunate than his own children.

Dkt. 810 at 1-2 (emphasis added).[2]  Likewise, at the sentencing hearing itself, Hodge's counsel advised the Court that "Singer would help Doug's children," and "Doug would make donations to universities." Ex. KK at 47-48 [Feb. 7, 2020 transcript].  He added that "after Singer created his 501c3, KWF . . . Singer explained that Doug's payments would fund summer sports camps to help under-privileged student athletes gain athletic scholarships," but that, "over time, as Doug came to see the deception behind Singer's athletic branding for his children and the *quid pro quo* nature of the donations, Doug made the terrible mistake of not pulling out, instead, continuing on with Singer." *Id.*  The Court thereafter sentenced Hodge to nine months in prison. *Id.* at 63-65.

F.  Hodge's Post-Sentencing Conduct

Two days after telling this Court that he was "accountable for [his] actions" and "prepared to accept the consequences of [his] wrongful conduct," Hodge penned an editorial in the Wall

---

[2]  Hodge also wrote: "[T]he government has disclosed to defendants that Singer informed parents that the side-door payments would benefit the universities, and has clarified that the government is pursuing a theory of bribery that defines a bribe as including payments intended to benefit a specific program at a university that induced a coach or administrator to participate in the fake athlete scheme." Dkt. 810 at 26.

Street Journal in which he portrayed himself as Singer's victim.   *See* Ex. LL [Hodge op-ed].   He wrote: "I was an easy mark," adding that he had erred by failing to "scrutinize the application process as carefully" as he should have, "to ask tough questions," and that he "looked the other way on questionable behavior[.]"  *Id.* at 2-3.  Hodge made no mention of his bribe payments to Ernst, but suggested that he viewed his payments to university programs as "what I thought was a win-win-win—a win for the universities, for my children *and for other people's children*."  *Id.* at 3 (emphasis added).  Hodge thus sought to characterize his theft of admissions slots from deserving students as a magnanimous act.

More recently, just two days before filing the instant motion, Hodge, through his attorneys, attempted to walk back his statements in the proffer interview—including that he "knew that the coach would benefit in some way," "knew by inference that a coach was in on it," "knew Singer was working with co-opted coaches in order to get kids in," and "believed there had to be a *quid pro quo* for it [*i.e.*, the scheme] to work."  *See* Ex. II at 10, 11, 13.  In a letter to the government, Hodge's attorneys contended that Hodge's proffer statements did not reflect his state of mind at the time he committed his crimes, but merely his "current understanding about how Singer operated, informed by discovery in this case and other information that has been made public since" Hodge's arrest.  *See* Ex. MM [Apr. 29, 2020 letter].  And, he asserted, he "did not contemplate or believe that a coach would personally benefit"—notwithstanding the fact that his initial payments as part of the scheme were made payable to Ernst personally and sent to his home address.  *Id.*  Hodge thus made the remarkable contention that he had proffered for the purpose of telling the government what he had learned from the government's discovery—*not* what he was thinking when he was actually committing the crimes to which he pled guilty.

## ARGUMENT

### I.      Legal Framework

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  It is settled in the First Circuit that a *Brady* trial claim may be raised in a § 2255 petition.  *See DeCologero v. United States*, 802 F.3d 155, 161 (1st Cir. 2015); *Conley v. United States*, 415 F.3d 183, 187 (1st Cir. 2005).  While the First Circuit has not squarely addressed whether *Brady* applies to sentencing, *see, e.g., United States v. Flete-Garcia*, 925 F.3d 17, 33-34 & n.5 (1st Cir. 2019), other Circuits have so held.[3]  *See, e.g.*, *United States v. Battle*, 560 Fed. Appx. 206, 207-09 (4th Cir. 2014) (unpublished); *Jefferson v. United States*, 730 F.3d 537, 553-54 & n.4 (6th Cir. 2013); *United States v. King*, 628 F.3d 693, 704 (4th Cir. 2011); *United States v. Alvarez*, 334 Fed. Appx. 995, 998 (11th Cir. 2009) (unpublished); *United States v. Walters*, 269 F.3d 1207, 1214-18 & n.6 (10th Cir. 2001).

Assuming the government's *Brady* obligations apply to sentencing, and may be raised in the context of a Section 2255 motion, *Brady* nevertheless does not create a general right to criminal discovery.[4]  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one.").  Rather, it

---

[3]  The Supreme Court has held that *Brady* applies in the context of sentencings in a death penalty case.  *See Cone v. Bell*, 556 U.S. 449, 474-76 (2009); *Strickler v. Greene*, 527 U.S. 263, 289-96 (1999).  It has not addressed the *Brady* rule in the context of a non-capital sentencing.

[4]  This District's Local Rules are consistent with this approach.  *See* Local Rule 116.2(a)(4) (defining exculpatory information to include information that tends to diminish the degree of a defendant's culpability or the defendant's offense level under the United States Sentencing Guidelines).

obligates the government to disclose evidence that is favorable to the accused and material to punishment. *See, e.g., United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011). For evidence to be "favorable," it must be exculpatory, and to be "material," there must be a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. *See Strickler*, 527 U.S. at 280. *Brady* applies only to information "known to the prosecution but unknown to the defense." *See, e.g., United States v. Bender*, 304 F.3d 161 (1st Cir. 2002); *see also United States v. Del-Valle*, 566 F.3d 31, 38 (1st Cir. 2009) (same).[5]

## II.    The Government Did Not Suppress *Brady* Material and Hodge Suffered No Prejudice

The thrust of Hodge's argument is that the government withheld evidence, and made material misrepresentations to the Court, concerning Hodge's "understanding that the payments he was making in connection with the college admissions process were donations to universities or university programs for the benefit of the universities, and *not* bribe payments to university employees for the personal benefit of those employees." (Def. Br. at 8.) That is untrue.

From the outset of this case and throughout the proceedings, the government has made clear that some (though not all) of Hodge's payments were styled as donations to university athletic programs. And the government produced extensive discovery about that fact long before Hodge chose to plead guilty (including a gift receipt from USC acknowledging his $75,000 "donation" to women's athletics). Ex. MM-1 [Apr. 15, 2015 USC gift receipt]. Hodge's own attorneys even acknowledged this in his sentencing memorandum, noting that *"the government has disclosed to*

---

[5] The Supreme Court has held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002). The Court reasoned that, even though "the more information the defendant has, the more aware he is of the likely consequences of a plea," it remains the case that the government has no obligation "to share all useful information with the defendant" during the plea negotiation phase of the proceedings. *Id.* at 629.

*defendants that Singer informed parents that the side-door payments would benefit the universities*, and has clarified that the government is pursuing a theory of bribery that defines a bribe as including payments intended to benefit a specific program at a university that induced a coach or administrator to participate in the fake athlete scheme." Dkt. 810 at 26 (emphasis added).[6]  Likewise, the government made clear that whether a payment is called a 'donation,' or is directed to a university athletic program instead of a coach's pocket, is irrelevant.   If money is provided in exchange for having a university insider secure the admission of a student as a purported athletic recruit based on fabricated credentials, the "donation" is a bribe.

In any event, little of this matters with respect to Hodge, because unlike many of the other defendants who have come before this Court, Hodge *did* make bribe payments to a coach personally—via checks made out to Ernst and sent to his home.   Hodge also *admitted*, to federal agents and under oath to this Court, that he understood his subsequent payments to university programs and to Singer's entities to be *quid pro quo* payments to facilitate the fraudulent recruitment of his children.   Accordingly, the information Hodge contends was withheld from him was information that was known to him, concerning what he was told, and what he himself understood. And Hodge used that information in his arguments to the Court. Any additional information the government disclosed on the same subject was simply more of the same, and was immaterial to Hodge's culpability, and to the sentence that this Court imposed.

---

[6] Hodge contends that "there is an important difference in state of mind and relative culpability between (i) knowingly paying a bribe to line the pockets of a university employee, and (ii) knowingly making a donation to a university or university program with the understanding that the payment is for the university's benefit."  [Def. Br. at 16.]  Even assuming, for the sake of argument, that is true, Hodge did both.  And the government disclosed to Hodge "that Singer informed parents that the side-door payments would benefit the universities," as his own sentencing memorandum acknowledged, and Hodge argued at sentencing that this fact should be taken into consideration in imposing his sentence.

A.    **The Government Did Not Suppress Exculpatory Information as to Hodge**

    1.    **Singer's iPhone Notes Were not Exculpatory as to Hodge**

Hodge contends that Singer's October 2nd iPhone notes are exculpatory as to him because they reflect that government agents "browbeat[]" Singer in pursuit of a "deeply dishonorable and unlawful, strategy" of eliding the "critical distinction" between "donations" and "bribes." (Def. Br. at 10.) That is not true.

As this Court has already concluded, "Singer's October 2nd statement was 1) made before Singer was fully cooperative with the government; 2) relative (primarily) to a sting operation involving parents not yet committed to Singer's 'program'; and 3) insofar as it did relate to future calls to be made to defendants, was in response to the agents' efforts to get Singer to corroborate, not fabricate, evidence." Dkt. 1169 at 7.  None of Singer's consensual calls prior to October 2 was to Hodge, and Singer's October 2nd notes did not relate to Hodge in any way.  The only consensual call Singer made to Hodge was weeks later.  In that call, during which Singer—acting at the direction of agents—used a ruse that his foundation was being audited by the IRS, Hodge acknowledged that his payments were intended as a *quid pro quo* to facilitate the fraudulent admission of his children, and told Singer not to worry about the audit because he was not "going off script here."  Hodge also recounted for Singer a conversation Hodge had with USC's Heinel, telling Singer: "We didn't talk about money.  There was no conversation about—there was no dollars discussed on that phone call.  But, you know, we're kind of talking in code here." *See* Ex. S at 6.

Moreover, even if the purported distinction between "donations" and personal bribes referenced in Singer's notes is potentially exculpatory as to some defendants, it is *not* exculpatory *as to Hodge*, who made payments to the Georgetown tennis coach *personally,* who acknowledged to Singer that his conversations with a complicit USC insider was "in code," and who *admitted* to

this Court and to the government that he knew his purported "donations" were a *quid pro quo* for the fraudulent recruitment of his children.[7]

Likewise, the fact that the government, as part of a sting operation, wanted Singer to be especially blatant about his scheme with defendants who were still pursuing it hardly suggests, as Hodge contends, that the crime was confusing or ambiguous to parents who had already committed it before the government began investigating—or, in Hodge's case, who had committed it so many times that he told Singer they didn't need to talk in "code" because Hodge knew "how this works."

## 2. The Government Did Not Withhold Exculpatory Material or Manufacture Evidence as to the LMU "Side Door"

Hodge's next claim—that the government withheld *Brady* material and manufactured evidence concerning his pursuit of the "side door" at LMU—is demonstrably false.

From the outset of his cooperation, in September 2018, Singer told the government that Hodge had agreed to use the "side door" to secure his third son's admission to LMU. *See* Ex. NN at 4 [Singer Sept. 27, 2018 Proffer] ("Hodge thought [LMU] was a side door deal . . . ."). Singer expressly told Hodge that process would be the *same* as it was for Georgetown and USC. *See* Ex. V (Singer e-mailed Hodge: "I am meeting with the LMU folks on Tuesday . . . . We should speak to make sure we are on the same page as we were for your other kids). And Hodge understood what this meant. As communications between Singer and Hodge make clear, Hodge (a) told Singer he wanted him to use "the Singer magic," *see* Ex. W at 8; (b) told Singer they didn't need to talk in "code" because Hodge knew "how this works," *see id.* at 9; (c) agreed to pay between $200,000 and $250,000 *after* his son's admission was secured, *see* Ex. X at 1-2; (d) agreed to

---

[7] And, of course, that fact could hardly be more obvious: Hodge's large payments to the USC Women's Athletics program, and to Singer's charity, upon receipt of a letter from USC indicating that his unqualified children were being admitted as athletic recruits, based on credentials that he knew were fake, were unambiguously a *quid pro quo*, and reeked of fraud, regardless of what they were called.

funnel the money through Singer's sham charity, *see id.* at 2; and (e) knew the identity of the LMU

basketball coach helping to secure his son's admission, *see* Ex. S at 3.

In fact, Singer told the government that, unbeknownst to Hodge, he did not actually intend

to pay any money to the LMU insider, but, rather, planned to keep Hodge's money for himself.

*See* Ex. OO at 3 [Singer Nov. 1, 2018 Proffer].  But Hodge thought the money would be passed

on to facilitate the fraudulent admission.  And the government disclosed this information to Hodge

*prior to his sentencing*, advising Hodge's counsel as follows*:*

> Singer told Hodge that, in exchange for payments to the Key Worldwide
> Foundation, [G.H.] would be admitted through the "side door" by the head
> basketball coach . . . [at LMU]—but, despite implying that a payment to the LMU
> coaches would be necessary to secure [G.H.'s] admission, Singer did not tell Hodge
> that Singer intended to keep all of the money.

Ex. PP at 2 [January 24, 2020 letter].

Hodge contends that the government's disclosure is inconsistent with one line in the FBI

report of Singer's November 1, 2018 proffer.   That report noted as follows:

> Hodge child, [G.H.], is applying to LMU through [Singer]'s friend.  Hodge will
> pay [Singer] for [G.H.]'s admission to LMU.  [Singer] will call his contacts at
> LMU for [G.H.]'s admission[], however, [Singer] does not have to pay anyone at
> LMU and will keep the money for himself/herself.  **[Singer] implied to Hodge**
> **that the money will be going to LMU.**

Ex. OO at 3 (emphasis added).   Hodge contends that the bolded statement "made no mention of

payments to an individual coach and instead referred exclusively to money going to *the university*

*itself*"—a fact that he contends is exculpatory.  (Def. Br. at 12.)  But that is untrue, for at least two

reasons.  *First*, the statement in the FBI report is simply an explanation of *why* Hodge was

unaware that Singer intended to keep the money for himself:  Singer implied to Hodge that the

money would be going to LMU; in fact, Singer did not have to pay anyone at LMU to facilitate

the admission and intended to keep the money.  *Second*, and more importantly, whether the money

was going to LMU to induce a coach to fraudulently admit Hodge's child as a basketball recruit,

or to the coach personally, is immaterial to Hodge's guilt or punishment.   Over the course of his involvement in Singer's conspiracy, Hodge made both kinds of payments—and he understood both to be a *quid pro quo*, as he admitted to the Court.   He understood fraud to be involved every time.   And, as he conceded in his own sentencing memorandum, *the government disclosed* to him "that Singer informed parents that the side-door payments would benefit the universities," and made clear that it "is pursuing a theory of bribery that defines a bribe as including payments intended to benefit a specific program at a university that induced a coach or administrator to participate in the fake athlete scheme." Dkt. 810 at 26.  Hodge's attempt to now claim he was surprised by similar information in the FBI report, or that this information somehow minimizes his culpability, is false, and belied by his own admissions.

### 3.   The Government Did Not Withhold any Other *Brady* Information

Finally, Hodge catalogues a list of additional evidence that he claims should have been disclosed prior to sentencing.   None of his claims has merit.[8]

- Hodge points to the fact that Singer told the government that Ernst told him the money he received would go "to the tennis program" and that Singer could "make a donation to the program."   But this is not exculpatory as to Hodge.   Regardless of where his money ended up, his payments were bribes.   And, in any event, it defies credulity to think that Hodge believed that payments he was making to Ernst personally, and sending to Ernst's home, in exchange for Ernst recruiting Hodge's daughter to play a sport she didn't play, were anything other than personal bribes that were lining Ernst's pockets. (Tellingly, Hodge did not even attempt to deduct those purported "donations" from his taxes, because the notion that they were charitable contributions is facially absurd.)

- Likewise, Hodge contends that Singer's proffer statement that "[i]nitally all the payments to USC went to the program" is exculpatory as to him.  It is not.  As noted, the fact that payments went to USC was disclosed by the government, and known to Hodge, before he pled guilty. And Hodge understood that those payments were in exchange for his children's fraudulent admission as athletic recruits, and has admitted that to the Court.

---

[8]   *See United States v. Peake*, 874 F.3d 65, 72 (1st Cir. 2017) ("In the *Brady* context, though, prejudice cannot be viewed in a funhouse mirror. . . .   It is not enough that a defendant thinks (or professes to think) that somehow, some way, his theory of defense would have prevailed had he had been given timely access to the allegedly withheld information.").

- Hodge contends that the government failed to disclose that Heinel told Janke that her scheme to admit fake athletes to USC in exchange for payments had been cleared by the USC admissions department.  But Hodge neglects to mention that Heinel made this self-serving statement *in the holding cell* following her arrest.  *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (no *Brady* violation occurred because, in part, the newly discovered government reports contained "untrustworthy" allegations).  Hodge also fails to inform the Court that this information was public long before he pled guilty, because Heinel's lawyer disclosed it.  *See* Ex. QQ [Sept. 3, 2019 New York Times article].[9]

- Hodge contends that a video of Singer's presentation to Starbucks executives, in which Singer used the term "side door," is exculpatory.  Not so.  Hodge omits to note that Singer's description of the "side door" in the video is virtually identical to—and thereby cumulative of—the way Singer discussed the "side door" in materials produced to Hodge before his sentencing.  *Compare* Ex. RR at 6 [Jul. 26, 2018 call transcript, in which Singer tells a potential client that he had "created a side door that is 1/10th the price of the back door"], *with* Ex. SS at 53 [video transcript, in which Singer states "the side door is figuring out how I can do that [*i.e.*, the back door] for 1/10th of the money[.]"].[10]  Hodge also fails to note that Singer did *not* tell his audience that the "side door" involved making payments as a *quid pro quo* in exchange for the fraudulent recruitment of applicants as purported athletes based on fake credentials.  Unlike the Starbucks executives, Hodge knew these additional details.  As he told Singer, he knew "how this works," and didn't need to speak "in code."

In sum, the government did not withhold exculpatory material from Hodge prior to his sentencing, and his motion should be denied on that ground.

### B.  Hodge Knew that his "Donations" to "Programs" Were Bribes to Gain Admission for his Children

Even assuming, for the sake of argument, that the information the government produced after Hodge's sentencing was exculpatory as to him, there was no *Brady* violation because, as set

---

[9] Contrary to Hodge's contention, there is no evidence that anyone in USC's athletic department above Heinel, or anyone outside the athletic department, was aware of or condoned Singer's scheme.  In any event, to the extent Hodge wished to argue that the university was not a victim, this argument was available to him before he pled guilty.  For example, co-defendant Robert Zangrillo filed a motion, seven weeks before Hodge pled, arguing that material the government produced to all defendants demonstrated that donations were a factor in USC admissions decisions.  *See* Dkt. 546.

[10] Hodge also misquotes Singer to make it appear as though Singer described the "side door" as a means of donating money "through 'institutional advancement.'"  But that is not what Singer said.  *See* Ex. SS at 53 ("So the front door is you get in on your own.  The back door is through institutional advancement; it's all the people writin' major, big checks.  And the side door is figuring out how I can do that for 1/10th of the money to get into the same school that is there.").

forth above, those disclosures were cumulative of other disclosures the government made, and all

the relevant information was, in any event, already known to Hodge.  *See Bender*, 304 F.3d at 161

("*Brady* applies to material that was known to the prosecution but *unknown to the defense*").

For example:

- The government produced emails and telephone calls in which Singer and Hodge used the term "donations" in discussing the side door.  *See, e.g.*, PSR ¶¶ 84, 114.

- The government told the Court during Hodge's Rule 11 colloquy that Hodge made payments to "specific programs at USC."  Hodge agreed with this statement of offense conduct and admitted that those were bribe payments.  *See* Ex. GG at 11-14.

- During Hodge's proffer, he told the government that Singer had described the payments as "donations" that would go to the university "programs" and other charitable organizations. *See, e.g.,* Ex. II at 3 ("Singer told Hodge he could get [S.H.] in through a donation to an athletic department.").

- Hodge's own sentencing memorandum repeatedly described his payments as purported "donations" that would be used to support university programs.  *See* Dkt. 810 at 1-2, 15.

- In an op-ed published in the Wall Street Journal the day after he was sentenced, Hodge described his payments as donations to underfunded university athletics programs.  *See* Ex. LL.

In short, Hodge knew—*before* his plea and sentencing—that Singer described his

payments as "donations" to university programs, and the government also disclosed this

information to him.

## C.     The Additional Disclosures Were Not Material to Hodge's Sentence

None of the information Hodge cites in his motion was material to his sentence.  *See*

*McCambridge v. Hall*, 303 F.3d 24, 37 (1st Cir. 2002) (en banc) ("[T]here is no prejudice under

*Brady*" unless there is a "reasonable probability" that "the result of the proceeding would have

been different.'") (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  That is because,

as set forth above, the fact that Hodge made payments styled as "donations" to university athletic

programs was disclosed to the Court at Hodge's plea hearing, in the pleadings prior to his

sentencing, and again at the sentencing hearing itself.   It was the very basis of Hodge's guilty plea.   For this reason, too, Hodge's motion should be denied.[11]

## III.    The Government Did Not Mislead the Court

Finally, Hodge contends that the government misled the Court about the nature of his payments by, among other things, calling them "bribes."   His argument is frivolous and disingenuous.   Hodge pled guilty to conspiracy to commit honest services fraud.   He agreed, under oath, that he possessed the requisite criminal intent to commit that crime. Hodge also told the government, during his proffer, that he understood his payments were not legitimate donations, but were in exchange for having his children recruited to college as purported athletes.   Hodge's contention that these *quid pro quo* payments were not "bribes" because they didn't go to coaches' pockets (even though Hodge made other payments that did go to Ernst's pocket) is no more honest than his description of his children's falsified applications as "athletic branding."   Hodge's penchant for euphemisms cannot mask the fact that he committed fraud and bribery. The government did not engage in misconduct by using accurate language to describe Hodge's crimes.[12]

---

[11]  Likewise, the government told the Court that Hodge's co-defendants were told that the money would be paid out as "purported donations" to the coach's programs.   *See* Ex. TT [Oct. 21, 2019 Elizabeth Henriquez plea transcript] ("Henriquez also agreed with Singer that she would pay $400,000 as a purported donation to Georgetown's tennis program as a *quid pro quo* . . . ."); Ex. UU [Oct. 21, 2019 Michelle Janavs plea transcript] ("Janavs agreed to pay $200,000 as a purported donation to USC Athletics as a *quid pro quo* . . . ."); Ex. VV [Mar. 31, 2020 Elizabeth Henriquez sentencing transcript] ("While this defendant might have been told that the coach was going to use her money for legitimate purposes. . . . the scheme was not legitimate, and this defendant knew that.").

[12]  Hodge's contention that the government misled the Court by referring to his payments as "black and white, 'line the pockets' bribery," is untrue.   The government referred to the payments simply as "bribes."   With respect to the USC bribe payments, the government told the Court that Hodge understood the payments were destined for the coach's program.   With respect to the Georgetown bribe payments, the government told the Court that the payments went to Ernst's pocket.   Hodge also claims that the government made misrepresentations to Judge

**IV.      Hodge Is Not Entitled to Withdraw His Plea to Money Laundering Conspiracy**

Hodge next contends that he should be permitted to withdraw his plea to money laundering conspiracy on the grounds that (1) the government's purported *Brady* violations "severely compromised" his decision to plead guilty to that charge; (2) he pled guilty due to "threats" and "coercion" by the government; and (3) the money laundering charge is "legally and factually unsustainable."   This claim is frivolous.

**A.      Only A Fundamental Defect that Results in a Complete Miscarriage of Justice Warrants a Plea Being Set Aside**

A defendant seeking to withdraw a guilty plea under Section 2255 must "show that the plea proceedings were marred by a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *United States v. Carrington,* 96 F.3d 1, 5 (1st Cir. 1996) (internal quotations and citation omitted).   "A prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea.'" *Wilkins v. United States*, 754 F.3d 24, 28 (1st Cir. 2014) (quoting *Ferrara v. United States,* 456 F.3d 278, 289 (1st Cir.2006)).

Thus, to prevail on such a claim, a defendant must first show that "some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea.'"   *Id.* (quoting *Ferrara*, 456 F.3d at 290); *see also United States v. Wilkins*, 943 F. Supp. 2d 248, 257 (D. Mass. 2013), *aff'd*, 754 F.3d 24 (1st Cir. 2014), and *aff'd sub nom. United States v. Merritt*, 755 F.3d 6 (1st Cir. 2014) (the crux of the first prong is "coercive misconduct that compromises a defendant's claim of *factual innocence*")

---

Woodlock regarding a different defendant.   Hodge presents no argument why representations to a different judge in a different proceeding about a different defendant are material to his claim under § 2255.   His contentions are, in any event, false.

(emphasis original). "'Second, [the defendant] must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.'" *Wilkins*, 754 F.3d at 28 (quoting *Ferrara*, 456 F.3d at 290). To satisfy the materiality requirement, the defendant must show a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial. *Id.* "In considering this claim, a court must determine 'whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession.'" *Wilkins*, 943 F. Supp. 2d at 257 (quoting *Ferrara*, 456 F.3d at 294). The materiality requirement is not satisfied where (1) a defendant admitted his factual guilt in open court at the time he changed his plea and does not make any assertion of factual innocence; (2) the evidence of the defendant's guilt was overwhelming; and (3) the newly-disclosed evidence does not provide the defendant with a viable defense. *See Wilkins*, 754 F.3d at 29–31.

**B.     There Was No Fundamental Defect in the Proceedings or Miscarriage of Justice**

Hodge first contends that his plea was marred by the government's failure to turn over exculpatory evidence that Singer told parents their payments were going "to the universities or university programs." That argument fails for the reasons set forth above: (1) such evidence was not exculpatory as to Hodge, who paid personal bribes totaling hundreds of thousands of dollars to Ernst to secure the admission of two of his children to Georgetown as purported tennis recruits; (2) as Hodge conceded, the government specifically "disclosed to defendants that Singer informed parents that the side-door payments would benefit the universities," and made clear that it "is pursuing a theory of bribery that defines a bribe as including payments intended to benefit a specific program at a university that induced a coach or administrator to participate in the fake athlete scheme," *see* Dkt. 810 at 26; and (3) Hodge admitted to the Court, under oath, and to the

government in a proffer interview, that Singer told him his money was going to universities or university programs, and that he knew these payments were a *quid pro quo* to secure the admission of his children.  Accordingly, Hodge's contention that the evidence supports a claim of factual innocence is without merit.

Hodge next claims that the government coerced him to plead guilty to money laundering by threatening to charge him with federal programs bribery.   That is false.   In late September and early October, after unsealing a separate indictment charging another college admissions defendant, Xiaoning Sui, with conspiracy to commit federal programs bribery, the government received inquiries from counsel for several defendants about whether it intended to seek a superseding indictment adding a federal programs bribery charge in this case.   Hodge's counsel approached the government about a plea immediately thereafter, and the government at that time confirmed to Hodge's counsel, and counsel for other defendants, that it intended to seek a superseding indictment adding a similar charge against the remaining defendants.   There is nothing remotely improper or even unusual about such an acknowledgment, and it is hardly a threat.   Indeed, in many cases, the government discloses its intention to seek a superseding indictment in open court. *See, e.g., United States v. Ponzo*, 97-cr-40009-NMG-5, 2012 WL 5385685, at *3 (D. Mass. Oct. 31, 2012) (noting that "the Government intends to supercede the indictment to add new charges that have been under investigation since Ponzo's arrest last year").  Here, the disclosure provided Hodge an opportunity to avoid an additional charge the government subsequently brought against his co-defendants.   Indeed, Hodge confirmed to the Court, under oath, and accompanied by his lawyers, that his plea had not been induced by "any promise or assurance . . . of any kind in an effort to make [him] plead guilty," and the Court found that his decision to plead guilty was knowing and voluntary.  *See* Ex. GG at 5 &15.

Finally, Hodge contends that the charge of money laundering is "legally and factually unsustainable," "legally invalid" or "unfounded," "for the simple reason that the conduct alleged in the Indictment does not involve any [] proceeds of specified unlawful activity," insofar as "the funds Hodge used in connection with the scheme were the proceeds of his lawful employment." [Def. Br. at 26–29, 31–32.]   Unless Hodge is suggesting that his attorneys were constitutionally ineffective insofar as they allowed him to plead guilty to a crime he could not have committed and that they believed was legally invalid—without advising the Court of their concerns at the time of his plea—this contention is perplexing.   Hodge pled guilty to conspiring to commit wire fraud and honest services wire fraud.   He does not seek to withdraw that plea.   As part of that conspiracy, he funneled bribes and other payments through Singer's sham charity and his for-profit corporation, knowing that the money would be used to facilitate the scheme.   Even now, he does not contend that the money was for some other purpose.   As the government has separately explained, the money Hodge sent to KWF and The Key constituted completed wires in furtherance of the underlying scheme—rendering him guilty of wire fraud at that moment, even without more. *See* Dkt. 1170 at 53-59. But the scheme continued, and the payments thus also constituted a completed phase of the ongoing scheme.   Accordingly, the moment Hodge made those payments to Singer's entities, his "clean" funds became "tainted by crime," *United States v. Richard*, 234 F.3d 763, 769 (1st Cir. 2000), and became proceeds of specified unlawful activity. The government also alleged, and Hodge admitted under oath, that he channeled the money through Singer's entities in order to conceal the nature and source of the payments.   That is quintessential money laundering. There was, accordingly, nothing defective about Hodge's plea to money laundering conspiracy.

## CONCLUSION

For all of the reasons set forth above, Hodge is not entitled to a re-sentencing or to withdraw his plea to the money laundering conspiracy and his motion should be denied without a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Justin D. O'Connell*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
STEPHEN E. FRANK
KARIN M. BELL
Date:  May 29, 2020          Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 29, 2020.

By:     */s/ Justin D. O'Connell*
JUSTIN D. O'CONNELL
Assistant United States Attorney